UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
Case No. 16-cv-20872-LENARD/GOODMAN

JESUS LAZARO COLLAR,

    Plaintiff,

v.

ABALUX INC. and
JUAN D. CABRAL,

    Defendants.
_____/

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ABALUX, INC. ("ABALUX"), and JUAN D. CABRAL ("CABRAL"), referred to collectively as "Defendants," through undersigned counsel, and pursuant to F.R.Civ.P 56(c) and L.R. 56.1, moves for entry of a summary judgment against JESUS LAZARO COLLAR ("COLLAR") A concise statement of undisputed material facts is filed simultaneously. Exhibits referred to in this motion are found under the tab in the Appendix which accompanies this motion.

### I. Overview of Claims and Defenses

Plaintiff brings a claim under the Fair Labor Standards Act for overtime pay. Defendants claim Plaintiff is not entitled to overtime pay because ABALUX was not an "enterprise engaged in commerce" in any year that Plaintiff worked for it because by virtue of its failure to have $500,000.00 or more in annual gross volume of sales. Defendants further contend that Plaintiff is not individually covered by the FLSA because he did not

order goods or materials from out of state or travel out of state in connection with his job duties.

## II.  Legal Standards
.
The purpose of a summary judgment motion is "...to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).  Defendants must either show that Plaintiff has no evidence to support his case or present "affirmative evidence demonstrating that Plaintiff will be unable to prove its case at trial." United States v. Four Parcels of Real Property, 941 F. 2d 1428, 1437-38 (11th Cir. 1991) (en banc).

While inferences from the evidence must be drawn in favor of COLLAR, he "may not rest upon mere speculation or denials", but "must set forth *specific facts* showing that there is a genuine issue for trial." [E.S.] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 202 (1986); Thompson v. Miami-Dade County, 2009 U.S. Dist. LEXIS 33486 (S.D. Fla. 2009). The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.   The relevant rules of substantive law dictate the materiality of a disputed fact.  Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).

Summary judgment in Defendants favor is warranted because there is no material disputed fact that ABALUX, INC. was not an "enterprise engaged in commerce" and COLLAR was not individually engaged in commerce during the Relevant Time Period. [1]

---

[1]    Since facts must be construed in a light most favorable to the non-moving party at summary judgment,  ABALUX uses the term "Relevant Time Period" in this motion to mean the period of Plaintiff's employment from 8/26/13 through 1/14/16. ABALUX does not concede a three year Statute of Limitation is appropriate assuming there is FLSA

## III. Argument

To be entitled to recover overtime pay under the FLSA, an employee must prove either that he works for an "enterprise engaged in commerce" or is individually covered. Enterprise coverage applies where: (1) the employer has two or more employees regularly and recurrently engaged in commerce, or has two or more employees regularly and recurrently 'handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person **and** (2) the employer's annual gross volume of sales is $500,000 or more. See Dent v. Giaimo, 606 F.Supp.2d 1357, 1360 (S.D. Fla. 2009).   A plaintiff's proof of enterprise coverage cannot be based on beliefs, speculation, or conjecture. Josendis v. Wall to Wall Repairs, Inc, 662 F. 3d 1292 (11th Cir. 2011); Arilus v. DiEmmanuele, 895 F. Supp 2d 1257 (S.D. Fla. 2012) aff'd, 522 Fed. Appx. 881 (11th Cir. 2013).

For "individual coverage" to apply under FLSA, Plaintiff must prove that he actually was engaged in commerce.  29 U.S.C. § 206(a)(1).  The work of employees "engaged in commerce" involves or relates to "the movement of persons or things (whether tangibles or intangibles, and including information and intelligence) among the several States or between any State and any place outside thereof."  29 C.F.R. § 776.9; Steward v. Sterling Technical Solutions, LLC., 2012 U.S. Dist. LEXIS 93553 (M.D. Fla. 2012).

---

jurisdiction and reserves its Statute of Limitations defense to limit unpaid overtime to two years.  COLLAR filed his complaint on 3/9/16.

<u>Plaintiff is not Individually Covered by the FLSA</u>

Plaintiff's complaint does not allege that he, himself, engaged in interstate commerce. [DE 1]. Even if it did, any attempt by Plaintiff now to establish individual coverage is hindered by his discovery responses and deposition testimony. Plaintiff admitted that 1) he performed all of his work within the State of Florida and 2) he did not order goods or materials from out of state for use in ABALUX's business. [TAB I, Collar Depo, pp. 121-122; TAB J, Collar responses to RFA # 1 and # 3;].

Plaintiff's admissions establish there is no disputed issue of fact that Plaintiff is not entitled to overtime as an individual who engaged in commerce and require entry of summary judgment in ABALUX's favor on the issue of individual coverage.

<u>Enterprise Coverage</u>

29 U.S.C. § 203(s) sets out criteria by which to determine whether an employer is covered by the FLSA. ABALUX has admitted that it engaged in interstate commerce and employed two or more employees who handled goods and materials that had moved through commerce. Plaintiff's case, therefore, hangs on his ability to present ***definitive*** proof that ABALUX's annual gross volume of sales or business done met or exceeded $500,000.00 exclusive of excise taxes at the retail level which was separately stated during the Relevant Time Period. See 29 U.S.C. § 203(s)(1)(A)(ii).

The FLSA defines a "sale" to be "any sale, exchange, contract to sell, consignment for sale, shipment for sale or other disposition." 29 U.S.C. § 203(k). Congress' definition of "sale" implies that a business owns or has a possessory interest in the inventory, assets, goods or services it offers in exchange for consideration. The U.S. Department of Labor's ("DOL") regulations and guidelines express this intent. As an example, 29 CFR.

779.331 states: "In considering whether there is a sale of *goods* or *services* and whether such *goods* or *services* are sold for resale in any specific situation, the term "sale" includes, as defined in section 3(k) of the Act, "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." [E.S.].

Not every transaction by a business under the FLSA constitutes a "sale." See, Lopez v. Ans, 2010 U.S. Dist. LEXIS 7543 (S.D. Fla. 2010) [loan is not a "sale" or "business done", only interest derived from a loan counts towards $500,000.00 threshold]; Jensen v. Johnson County Youth Baseball League ,838 F. Supp 1437 (D. Kan. 1981) [value of government land leased as a sports field is not counted as "business done"]. DOL regulations also establish that a business' annual gross volume of sales ***excludes*** customer returns, discounts, coupons ***and the like***. [E.S.] See, 29 C.F.R. § 259 and Marckenson v. Peker, 2011 U.S. Dist. LEXIS 121035 (S.D. Fla. 2011) applying that regulation.  Likewise, reimbursements and refunds do not count as sales. Martinez-Pinillos v. Air Flow Filters, Inc., 738 F. Supp. 2d 1268 (S.D. Fla. 2010.)

A.    Methods of Accounting Accepted by DOL

29 CFR §779.265 establishes that a business's gross volume of sales or business done is to be measured by a twelve (12) month period which is either a calendar year, a fiscal year or by using the rolling quarter method, if appropriate. [2] The sales records

---

[2]    Per DOL regulation, the rolling quarter is used when a business has met the threshold for enterprise coverage in the year before but it is not clear whether the business will reach that threshold in the current year.   The rolling method does not apply here because ABALUX's annual gross volume of sales in 2012 and 2013 were well below the $500,000.00 threshold.  See [TAB A; TAB D, 6/2/17 Marcos Declaration]

maintained by a business as a result of *accounting procedures used for tax or other business purposes may be utilized to calculate gross volume of sales so long as the accounting procedure is used consistently* and the procedure accurately reflects the annual volume of sales or business done. Id.  Therefore, contrary to what Plaintiff argues, neither courts nor the DOL have adopted a "preferred" or required method of accounting for FLSA purposes.  ***It is the business and its accountants***---not an employee or his attorneys---who choose the accounting method by which to determine annual gross volume of sales.  The Eleventh Circuit has accepted that the cash method of accounting is an appropriate means of establishing FLSA jurisdiction.   Ar<u>ilus v. DiEmmanuele</u>, 895 F. Supp 2d 1257 (S.D. Fla. 2012), aff'd, 522 Fed. Appx. 881 (11th Cir. 2013).

When a business elects a calendar year and uses a cash basis method of accounting, its annual gross volume of sales is determined by the revenue that is *actually or constructively* received within a calendar year. See [TAB G, IRS Publication 538].

B.     ABALUX's Accounting Methods.

During the Relevant Time Period, ABALUX elected to use a calendar year as its fiscal year.   It also elected a method of accounting known as "cash/accrual."  The "cash/accrual" method of accounting allows a business to record a sale when the funds for that sale are actually or constructively received and to accrue accounts payable as an expense on its annual corporate income tax return.  [TAB E, Massa Declaration].   The "cash/accrual" method of accounting has been used by ABALUX since 2012.   [Id]. ABALUX's annual gross volume of sales, therefore, is measured by the revenue it actually or constructively *received* from January 1 through December 31st of each calendar year

during the Relevant Time Period.  [TAB D, 9/1/17 Marcos Declaration; TAB E, Massa Declaration; TAB F, 9/7/17 Cabral Declaration, TAB G, IRS Publication 538].

ABALUX consistently used an accounting program known as Quickbooks™ to track its sales and business receipts during Plaintiff's employment.  [TAB D, Marcos Declarations; TAB E, Massa Declaration;TAB F, Cabral 9/7/17 Declaration].  All of ABALUX's sales and all of its receipts, whether in the form of cash, checks, credit card payments or EFT's, were recorded in Quickbooks.™  [3] ABALUX's administrative assistant, Michelle Marcos, recorded each sale in Quickbooks upon receipt of payment by the customer.  [TAB D, 7/7/17 and 9/1/17 Marcos Declarations].

For example, when a sale was paid for by check, payment was recorded in Quickbooks by Ms. Marcos on the day the check was received from the customer, not the day the check cleared the bank.  When a customer paid for an order by credit card, Ms. Marcos recorded the sale in Quickbooks on the day the customer's credit card was run through the credit card terminal, not the day that the funds were released to ABALUX by the credit card processor.  She did the same for EFT payments and cash payments. [TAB D, 9/1/17 Marcos Declaration].

---

[3]   During the course of this case, ABALUX discovered that a temporary employee hired in 2015 had failed to record some transactions onto its State of Florida Department of Revenue sales tax reports ("DR-15s").  [TAB E, Marcos Declaration].  When discovered, ABALUX amended its DR-15s to *increase* the amount of tax it owed for 2015 as well as its 2015 corporate income tax return.  These amended returns were provided to Plaintiff before the discovery cut-off.

The same holds true for orders placed through ABALUX's website. [4] When a customer placed an order on ABALUX's website, Ms. Marcos created an invoice for the customer through Quickbooks and sent it to the customer's email address. When the customer opened the email and clicked on the invoice, it linked the customer to Intuit's website. [5] Intuit allowed the customer to pay for the order through credit card or EFT transfer and then automatically recorded in Quickbooks. Intuit recorded payment on the date it was, not the date that the funds into ABALUX's bank account. [Id].

C.    ABALUX's Gross Receipts for the Relevant Time Period

ABALUX's Quickbook™ registers showed the following figures for gross revenue in 2014, 2015 and 2016: [6]

    2014   $ 493,817.46

    2015   $ 505,973.33

    2016   $ 457,367.44

The gross revenue for each year ***included*** : 1) State of Florida sales tax which ABALUX was required to collect and remit to the Florida Department of Revenue ("FDOR") on all

---

[4] While ABALUX' website showed a "shopping cart" icon, it had no e-commerce platform where a customer could make a payment for the order on-line. [TAB D, 9/13/17 Marcos Declaration].

[5] Intuit owns and licenses the Quickbooks program. It also owns an on-line platform which can be used by Quickbooks licensees to receive customer payments. See intuit.com.

[6] Defendants' annual gross volume of sales or business done for 2012 ($208, 014) and 2013 ($368,017) were so low the Magistrate Judge determined any additional discovery was highly unlikely to uncover any revenue that would put ABALUX at or near the $500,000.00 threshold for enterprise coverage. The analysis in this motion, therefore, concentrates on the years 2014-2016.

non-tax exempt sales; and 2) building permit fees paid to local governments for which ABALUX advanced payment on behalf of customers and then sought reimbursement.

D.  Sales Tax at the Retail Level

The amount of sales tax collected by ABALUX during the Relevant Time Period for both retail and wholesale sales was reported to FDOR on monthly DR-15 reports that ABALUX filed under oath. [ TAB D, 7/7/17 Marcos Declaration; TAB F, 9/7/17 Cabral Declaration]. ABALUX reported the following amounts of sales tax to FDOR for the stated years: [7]

  2014: $ 8,880.88 for all customers [8]

  2015  $10,467,96 (broken down as $6,255.88 for retail sales and $4,212,08 for wholesale customers)

  2016  $ 9,140.35 for all customers

[TAB D, 7/7/17 and 9/1/17 Marcos Declarations]. ABALUX separately stated the amount of sales tax it was required to collect on customer invoices. [TAB B]. Therefore, in accord with 29 C.F.R. 203(s)(A)(ii), the amount of sales tax charged to retail customers was *excludable* from the revenue ABALUX collected and recorded in Quickbooks. See Eaton v. Blackman, 450 F. 2d.70 (8th Cir. 1971); Lopez-Santiago v. Coconut Thai Grill, 2014

---

[7] The discovery of unrecorded revenue in 2015 also required ABALUX to amend its DR15 reports for 2015. The amendments were completed and provided to Plaintiff before the discovery cut-off.

[8] ABALUX did not break down the sales tax in years 2014 and 2016 into that charged at the retail level and wholesale level because even if the entire amount of sales tax collected for those years was deemed to be at the wholesale level (and therefore counted as part of annual gross volume of sales), it still would not put ABALUX at or over the $500,000.00 threshold. ABALUX did break down the sale tax for 2015 into retail and wholesale for the purposes of summary judgment. [TAB D, 9/1/17 Marcos Declaration].

Page **9** of **18**

U.S. Dist. LEXIS 27028 (N.D. Tex. 2014); Donovan v. Recoil Corp., 1983 U.S. Dist. LEXIS 16027 (E.D. La. 1983).

Even if no there were no other receipts that were excludable in 2015, the deduction of retail sales tax would place ABALUX's 2015 gross sales at $499,717.45 -- "close but no cigar" to reaching FLSA coverage.

E.    Building Permit Fees

Building permits issued by local governments were required by customers for certain sign installations. CABRAL's 9/7/17 declaration [TAB F] explains in that in some cases ABALUX not only sold a sign but its services for installation of the sign. When installation required local government permitting and inspections and ABALUX was requested to assist in these processes, ABALUX charged the customer a permit processing service charge.

The permit processing service charge covered the company's time involved in preparing a package of drawings and specifications for the sign project, submitting the package to the local government's building department for approval, conferring with building department officials and calling for and being present for building department inspections. The permit processing service charge was shown on the customer's invoice as a separate entry. [TAB C]. But, the charge **_did not include_** the cost of the _actual building permit_ which always remained the customer's responsibility. [TAB F, Cabral Declaration]. That a building permit was not a service or commodity that ABALUX stocked, sold, re-sold or could transfer to a customer is demonstrated by the following:

First, a building permit is not a "thing" which ABALUX owns or had the ability to possess or control. Building permits are issued by the local government of the jurisdiction

in which the customer's sign is to be installed.  Local governments, therefore, "own" the permit and "sell" the permits.  Local governments do not give ABALUX or any other entity the right to stock, sell or re-sell building permits.  Building permits are issued ***one at a time and only if each particular application is approved by the local government's building department.***  ABALUX has no say in whether a building permit will, should or should not be issued. [Id].

Second, when ABALUX applies to a local government for a building permit, it is doing so on behalf of the customer.  The building permit is issued *in the customer's name*. ABALUX acquires no rights in and to the building permit.  The local government continues to retain control over the permit and has the right to revoke it until the sign project is completed and inspected by the local government's building official.  In effect, a building permit is a *license* issued by a local government to a customer to erect a sign.  [Id]. Although ABALUX may outlay money to pay for a customer's building permit, its invoice for reimbursement is not a "re-sale" of the permit because it never had an ownership rights or a possessory interest in the permit in the first place..

Third, unlike inventory or services which ABALUX offers for sale, ABALUX has no ability to set the fees charged for a building permit.   A local government controls the "price" it will charge for building permits in its jurisdiction.  And, because building permit fees vary from government to government and from job to job, ABALUX could not tell a customer in advance how much a check should be made out for to pay its permit fee.  [Id].

For that reason, and in order to expedite the issuance of the building permit, ABALUX adopted a practice to outlay its own funds to pay for the local government's permit fee and then seek reimbursement by separate invoice (created through

Quickbooks) to the customer. [9] [TAB F, Cabral 9/7/17 Declaration; TAB C].   ABALUX tacked no other charges onto the invoice such as state sales tax because *first*, under Florida law, a building permit is not a "tangible" piece of property and *second*, a building permit was not being "sold" or "re-sold" by ABALUX.  See, 29 CFR. 779.331 and F.S. 212.02(15).[10]   When the customer paid ABALUX's invoice for the permit fee, the customer was simply paying back a loan made by ABALUX.  No interest was added to the loan.  See Perez v. Ans, *supra*.

Because ABALUX lacked the ability to "sell, exchange, contract to sell, consignment for sale, shipment for sale or otherwise dispose" of building permits,  the sum of $6,486.13 which ABALUX received in reimbursements from customers for building permit fees it outlaid in 2015 does not count as "sales" or "business done."  29 U.S.C. § 203(k), 29 C.F.R. 541.501 (b) and  Martinez- Pinillos v. Air Flow Filters, Inc., 738 F. Supp

---

[9] The total amount of building permit fees which ABALUX advanced paid to local governments on behalf of its customers was the following for the stated years:

```
2014   $ 4,122.36
2015   $ 6,597.13
2016   $ 6,058.30
```

Like sales tax, ABALUX did not break down building permit fee reimbursements it invoiced versus those actually paid in tax years 2014 and 2016 because even if the entire amount of building fee reimbursements for these years were counted towards annual gross volume of sales, they still would not put ABALUX at or over the $500,000.00 threshold.  ABALUX did break down the building fee reimbursements it invoiced and the reimbursement payments it actually received in 2015 for the purposes of summary judgment. [TAB D, 9/1/17 Marcos Declaration].

[10]     Indeed, the State of Florida's definition of "sale" nearly tracks DOL's definition of "sale": "Any transfer of title or possession, or both, exchange, barter, license, lease, or rental, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration."

2d. 1268 (S.D. Fla. 2010).   The bottom line is that ABALUX's annual gross volume of sales for 2015 totaled **_$493,231.32_**. [11]

The evidence is clear and indisputable that ABALUX never met the definition of an "enterprise engaged in commerce" during years 2012-2016 because of its inability to meet the $500,000.00 threshold required by 29 U.S.C. 203(s)(A)(ii).   Nor does COLLAR have evidence to dispute the accuracy of ABALUX's 2014-2015 tax returns, Quickbooks™ register or the amounts ABALUX declared and remitted to FDOR in sales tax.  COLLAR had no clerical responsibilities at ABALUX. [TAB J, Collar response to RFA # 12]. He also had no responsibilities for preparing estimates or quoting prices for customers. He did not know if orders were cancelled or refunds were given to customers.   He had no responsibility for collection of unpaid invoices [Id, Collar responses to RFP #7, #8, #9, # 11 and #12].

Likewise, COLLAR had no personal knowledge of ABALUX's gross annual volume of sales.  He could only guess based on how much he thought the employees were paid. [TAB I, Collar Depo, pp. 105:5-107:7; 111:11-25].   He did not have access to pricing information or how much a customer was charged for a job [Id, p. 113:6-114:2] except on one day when he saw a monitor that displayed the prices of some orders. [Id, p. 107:13-108:19].

COLLAR's position did not require him to use or access Quickbooks.   [TAB J, Collar response to RFA # 15].   He had no responsibility for entering customer invoices

---

[11]   This figure is higher than the gross sales figure Mr. Massa stated on line 1(a) of ABALUX's  amended 2015 tax return because his calculation deducted all sales tax, not just at the retail level and building permit fee reimbursements. [TAB E, Massa Declaration].

into Quickbooks or for making sales for the company. [Id., Collar response to RFA # 4 and # 6]. Nor was he responsible for paying state sales taxes to FDOR. [Id., Collar's response to RFA # 17].

COLLAR never had access to, or saw, any documents or communications between ABALUX and its accountant. [Id., Collar responses to RFA # 18 and #19]. did not have access to ABALUX's tax returns and tax schedules. [Id., Collar responses to RFA #20, #21 and #27]. Plaintiff has no documents which contradict the accuracy of ABALUX's tax returns or DR-15's. [Id., Collar responses to RFA # 25, #26, #28]. Importantly, COLLAR has not designated an expert accountant.

COLLAR may argue that ABALUX's annual gross volume of sales should include payments received after January 1st of each tax year for orders placed in the prior year. However, the cash method basis of accounting is not based on the date of invoice but on the date of _receipt_ of payment. [TAB E, Massa Declaration]. As a last attempt to find a toehold into FLSA coverage, COLLAR may argue that ABALUX and a business run by CABRAL's father constitute a joint enterprise. [12]  A joint employment relationship exists

---

[12]   Defendants address the joint enterprise theory without prejudice to their position that COLLAR has waived his right to amend and add a joint enterprise theory to this case. COLLAR never pled a joint enterprise theory and did not amend his complaint to add this claim despite knowing from March, 2016 that ABALUX claimed it did not meet the $500,000.00 threshold for enterprise coverage. Defendants did not consent to an amendment. The joint enterprise theory was first raised in the deposition of Michelle Marcos taken on 7/20/17. The deadline for amending pleading has long passed. COLLAR cannot amend his pleadings through the "back door" of a deposition.  See, Hurlbert v. St. Mary's Health Care System, Inc., 439 F.3d 1286, 1297 (11th Cir. 2006); Velez v. Alexim Trading Corp, 2011 U.S. Dist. LEXIS 129410 (S.D. Fla. 2011) [party cannot raise new theory at summary judgment]. See also Berry v. Smith, 2008 U.S. Dist. LEXIS 60116 (S.D. Ala. 2008) [ party cannot amend pleadings through arguments first raised at summary judgment stage].

"where a single individual stands in the relation of an employee to two or more persons at the same time." <u>Gonzalez-Sanchez v. Int'l Paper Co.</u>, 346 F.3d 1017, 1020 (11th Cir. 2003). Under the FLSA, "a worker can be economically dependent on, and thus jointly employed by, more than one entity at the same time." <u>Id.</u> at 1021.

In determining whether a joint employment relationship exists courts consider the following factors: (1) the nature and degree of the putative employer's control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the right, directly or indirectly, to hire, fire or modify the worker's employment conditions; (4) the power to determine the worker's pay rates or methods of payment; (5) the preparation of payroll and payment of worker's wages; (6) the ownership of the facilities where the work occurs; (7) whether the worker performed a line job integral to the end product; and (8) the relative investment in equipment and facilities. <u>Antenor v. D&S Farms</u>, 88 F.3d 925, 932 (11th Cir. 1996). <u>Quezada v. Sante Shipping Lines, Inc</u>., 2013 U.S. Dist. LEXIS 45592 (S.D. Fla. 2013) citing 29 C.F.R. § 779.238.  To test whether a joint enterprise exists, courts must "look beyond formalistic corporate separation to the actual, pragmatic operation and control" of the business entities. <u>Cornell v. CF Ctr., LLC</u>, 410 Fed. Appx. 265, 268 (11th Cir. 2011).

The sole "evidence" that supports COLLAR's theory is that CABRAL's father and CABRAL each own a sign business.  However, there is nothing else that ties the two businesses together.   CABRAL's 9/15/17 declaration [TAB F] establishes that:

- CABRAL is not an officer, director, shareholder, employee or agent of his father's business and vice versa;

- Each business employs its own workforce and each has its own payroll;
- Each maintains separate business records;
- ABALUX has never prepared payroll for Cabral's father's business or vice versa;
- ABALUX has never supervised employees of Cabral's business or determined whom he should hire or fire and vice versa;
- The businesses do not share or exchange employees;
- The businesses each lease their own business premises and have their own equipment and machinery;
- The businesses have different bank accounts and tax identification numbers;
- CABRAL is not an authorized signer on his father's business's bank account and vice versa;
- The businesses do not loan each other money;
- To the best of CABRAL's knowledge, his father's business has a totally different base of customers;
- The businesses do not share or trade inventory or jointly order supplies; and
- Each business has its own business licenses.

Therefore, to the extent that COLLAR might attempt to amend at this stage (there is no allegation in the complaint of a joint enterprise theory)  there is no disputed issue of

fact that ABALUX operates apart from CABRAL's father's business and they do not constitute a joint enterprise.

### Conclusion

COLLAR has no evidence that ABALUX hid income, attributed income to the wrong tax year, was a joint enterprise or ever met or exceeded the $500,000.00 threshold for enterprise coverage in any year that he worked for ABALUX.  His mere speculation about ABALUX's daily revenues based on a one time glimpse of orders on a screen and guestimates of employees' wages are insufficient to prevent entry of summary judgment in ABALUX's favor for all years in the Relevant Time Period.

WHEREFORE, ABALUX respectfully moves the Court to enter summary judgment in its favor based on the lack of enterprise coverage or individual coverage under the FLSA for the Relevant Time Period, and award ABALUX its attorney's fees as sanctions for having to defend this case after Plaintiff and his counsel knew or should have known that there was no FLSA coverage and no law to support his claim as well as his costs.

Respectfully Submitted,

LANGBEIN & LANGBEIN, P.A.
Counsel for the Defendants
8181 NW 154 St., Suite 105
Miami Lakes, FL. 33016
Ph: 305-556-3663
Fax: 305-556-3647
Email: langbeinpa@bellsouth.net

By: /s/ Leslie W. Langbein
    Leslie W. Langbein, Esq.
    Fla. Bar No. 305391

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that a copy of the foregoing was filed electronically on 9/15/17 through CM/ECF and that a copy of the foregoing will be served via notification through CM/ECF on all counsel or parties of record on the attached service list.

By: /s/ Leslie W. Langbein
Leslie W. Langbein, Esq.

## SERVICE LIST

J. H. Zidell, Esq.
zabogado@aol.com
K. David Kelly, Esq.
David.kelly38@rocketmail.com
Rivkah Jaff, Esq.
Rivkah.jaff@gmail.com
J.H. ZIDELL, P.A.
300 71st Street, Suite 605
Miami Beach, FL 33141
Tel: (305) 865-6766
Fax: (305) 865-7167
Attorneys for the Plaintiff