# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 16-20872-CIV-LENARD/GOODMAN

JESUS LAZARO COLLAR,

      Plaintiff,

v.

ABALUX, INC., et al.,

      Defendants.

_____/

## ORDER ON DEFENDANTS' VERIFIED MOTION FOR SANCTIONS AGAINST PLAINTIFF'S COUNSEL

"The greatness of the man's power is the measure of his surrender."

> - William Booth (1829 – 1912) (British Methodist preacher who founded The Salvation Army)

This Order requires an assessment of Plaintiff's counsel's conduct. It involves the distinction between zealous advocacy (which is permitted) and a never-give-up strategy of using a full-throttle approach toward discovery and the applicable jurisdictional theory regardless of the accuracy of the underlying legal argument and of the evolving factual representations (which is not permitted).

Defendants' verified motion for sanctions seeks an award of attorney's fees and costs against Plaintiff's attorneys (only) based on their failure to cease fighting over an issue that proved fatal to their client's Fair Labor Standards Act ("FLSA") case (and that

led to a summary-judgment order in Defendants' favor). [ECF No. 124].

The Undersigned concludes that Plaintiff's counsel unreasonably continued to pursue the claim against Defendants Abalux, Inc. and its principal, Juan Cabral, even though it became clear in the midst of litigation that the law did not support their jurisdictional theory concerning the claim for 2015 wages. Plaintiff's counsel did not dismiss the claim despite being served with seven Rule 11 motions (from February 24, 2017 through September 19, 2017). All of the Rule 11 motions that defense counsel served on Plaintiff's counsel also sought sanctions under 28 U.S.C. § 1927 and the Court's inherent authority.

The Undersigned finds that Plaintiff should have voluntarily dismissed his claim for 2015 wages by no later than September 14, 2017, when Defendants filed their opposition response to Plaintiff's motion for partial summary judgment. [ECF No. 66]. In their response, Defendants pointed out that Plaintiff (1) relied upon incorrect summaries (prepared by his law firm) of Abalux's financial records[1] and (2) urged an incorrect legal principle concerning the cash basis method of accounting. [ECF No. 66-5, pp. 14-15]. As a result, the Undersigned **grants** the sanctions motion and enters an award against the attorney who signed those papers and his law firm. For reasons outlined below, the award against the **attorney** is based on all three grounds (Rule 11, §

---

[1]     Defendants first advised Plaintiff's counsel about the inaccuracies in their charts and graphs in their September 1, 2017 verified response opposing Plaintiff's appeal of a discovery order. [ECF No. 61].

1927, and the Court's inherent authority), while the award against the *law firm* is based on Rule 11 and the Court's inherent authority only. Also, the motion will not be granted against two of the three attorneys named in the sanctions motion.

However, the amount awarded is significantly less than the total urged by Defendants -- because (in large part) the responsibility for fees and costs did not occur until after certain discovery was provided (as opposed to responsibility arising from the start of the lawsuit) and after counsel was expressly put on notice that Plaintiff continued to urge an incorrect legal theory for calculating the 2015 revenues. In addition, the amount takes into consideration Plaintiff's position that the discovery responses provided by Plaintiff were evolving and, at times, inconsistent (and therefore justified the propounding of additional discovery on Defendants).

Although Defendants cite myriad examples of purported misconduct that they say justifies a hefty sanctions award, only a portion of the alleged bad faith occurred after Plaintiff was on notice of his use of an incorrect legal theory and his reliance on erroneous charts. Therefore, the attorney's fees and costs begin to run from the time these events occurred. Both events -- learning the specifics of why Defendants took the position that Plaintiff's legal theory was improperly advanced and learning that the exhibits submitted to support the partial summary judgment motion were incorrect -- occurred at nearly the same time.

Therefore, the Undersigned is not awarding sanctions merely because of

Plaintiff's counsel's seemingly never-ending efforts to obtain more and more discovery. Instead, the sanctions award is based on counsel's continued reliance on an incorrect legal theory (i.e., the incorrect representations to the Court about how revenue "must" be reported) and their failure to rescind incorrect exhibits submitted in support of his partial summary judgment motion. Each of the two grounds is independently sufficient to justify a fee-shifting sanctions award.

Thus, if Plaintiff's counsel and their law firm were to pursue objections to this award, then Judge Lenard (or an appellate court) could affirm the sanctions award on one of the grounds even if Judge Lenard or a reviewing court were to disagree with the other ground. *Cf. Thompkins v. Lil' Joe Records, Inc.,* 476 F.3d 1294, 1303 (11th Cir. 2007), *cert. denied,* 128 S.Ct. 613 (2007) (reviewing court can affirm summary judgment on any legal ground, regardless of the grounds addressed and relied upon by the lower court); *Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging Co.,* 286 F.3d 1233, 1263 (11th Cir. 2002) (noting that appellate court may affirm ruling below "as long as the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court") (internal quotation omitted).

Finally, this Order also authorizes Defendants to file a supplemental application for fees and costs incurred after January 31, 2018, the last date for legal services listed in the billing records. Thus, Defendants are entitled to fees and costs connected to their filing of the sanctions motion and legal work related to it, such as reviewing Plaintiff's

opposition, and preparing a reply memorandum.[2] And they are entitled to fees incurred in connection with their motion to tax costs and non-taxable costs.

In order to eliminate confusion over the amount of fees and costs that Defendants should be awarded, defense counsel shall, by **July 13, 2018**, file a declaration and supporting backup documents (i.e., billing records and costs-related documents) disclosing the amount of fees and costs incurred from September 15, 2017 (the day after they filed the opposition to Plaintiff's motion for partial summary judgment) to date.[3]

**Procedural and Factual Background (In General)**

Judge Lenard outlined the relevant facts and procedural history in her Order denying Plaintiff's motion for partial summary judgment and granting Defendants' summary judgment motion. [ECF Nos. 58; 68; 97]. The Undersigned will provide relevant excerpts from that summary judgment ruling as the factual and legal background for the sanctions motion being evaluated here:

Abalux was a small sign company owned and operated by Juan D. Cabral,

---

[2]  *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1297-1302 (11th Cir. 2010) (finding that the trial court may award the moving party costs, expenses, and attorney's fees for successfully litigating a sanctions proceeding).

[3]  Although defense counsel mentioned the cash basis accounting method at an August 3, 2017 discovery hearing (discussed later in this Order), the September 14, 2017 memorandum (opposing Plaintiff's motion for partial summary judgment) provided the legal specifics underlying her position.

located in Hialeah, Florida. (Defs.' Facts ¶¶ 1-2).[4] It manufactured and installed signs, banners, and car wraps; it also sold sign-making materials to other businesses. (Id. ¶ 1). Abalux recorded all of the revenue it received in the QuickBooks™ accounting software program. (Id. ¶ 8).

At least as far back as 2012, Abalux used a cash/accrual[5] basis method of accounting. (Id. ¶ 10). This system of accounting allows a business to record a sale when the funds for the sale are actually or constructively received. (Id.).

The election of a cash/accrual method of accounting allowed Abalux to use the cash basis method as its accounting method for annual gross receipts. (Id.). Pursuant to the cash basis method of accounting, Abalux deemed a sale to be made when the services or goods were paid for by the customer, not when an invoice was created. (Id.).

Abalux elected to use a calendar year as its fiscal year so its federal corporate income tax returns were prepared based on monies it received in hand from January 1st through December 31st of each year. (Id. ¶ 12). Abalux filed federal corporate income tax returns showing the following gross sales for the year indicated:

2012 $208,014
2013 $368,017
2014 $487,007

---

[4]     The Undersigned will use the same citations as Judge Lenard did in her Order. [ECF No. 97].

[5]     In context, it is clear that the reference to "cash/accrual" basis refers to a cash basis of accounting.

<div style="margin-left: 2em;">

2015 $479,014

2016 $445,727

</div>

(Id. ¶ 13). Abalux filed an amended 2015 tax return showing gross receipts of $489,019.

(Id. ¶ 13 n. 2). Abalux's tax preparer and accountant, Sergio Massa, excluded sales tax and permit fee reimbursements from gross revenue when he prepared Abalux's 2015 tax return. (Id. ¶ 23).

Abalux's QuickBooks™ registers for the years 2014, 2015, and 2016 showed the following gross receipts (which include additional sums that were not attributable to sales, such as sales tax):

<div style="margin-left: 2em;">

2014 $493,817.46

2015 $505,973.33

2016 $457,367.44

</div>

(Id. ¶ 14). Abalux was required to collect and remit Florida state sales tax of 7% on all taxable goods and services. (Id. ¶ 15). Abalux reported the amount of sales tax it collected on a monthly basis on a form known as a "DR15," which is filed under oath. (Id.). Abalux filed amended DR15s for 2015, stating its tax liability to the Florida Department of Revenue as $10,467.97. (Id.). Of this amount, $6,255.88 was attributable to sales tax collected at the retail level. (Id.).

Plaintiff was employed by Abalux as a laborer from August 2013 to January 2016. (Id. ¶ 24). His primary responsibilities were making and installing signs. (Id. ¶ 25). During 2015, there were weeks during which Plaintiff worked more than 40 hours but was not compensated at a rate equal to or greater than time-and-a-half. (Pl.'s Facts, ¶ 2).

On March 9, 2016, Plaintiff instituted this action, filing a Complaint for overtime wage violations under the FLSA. (D.E. 1). Therein, Plaintiff sought to recover unpaid overtime wages from 2013, 2014, 2015, and 2016. (Id. ¶ 14). Plaintiff has since abandoned his claim for overtime wages earned in 2013. (Pl.'s Resp. at 2 ¶ 3).

During the pendency of this case, a number of discovery issues arose. Relevant here, on August 7, 2017, the Undersigned issued a post-hearing Order permitting Plaintiff to fully explore Abalux's 2015 finances, including payments received in 2016 for goods sold and services rendered in 2015. (See D.E. 54). However, the Undersigned did not require Defendants to produce additional discovery regarding Abalux's finances for other years. (Id. at 3). On August 18, 2017, Plaintiff appealed the Undersigned's Order to Judge Lenard in a Motion to Overrule Judge Goodman's Post-Discovery Hearing Order, Permit Depositions, Require Further Discovery Responses, and to Extend all Deadlines by at Least 90 Days. (See D.E. 56). On October 20, 2017, Judge Lenard denied Plaintiff's Motion, finding that the Undersigned's discovery Order was not clearly erroneous or contrary to law. (D.E. 86).

The Parties filed cross-motions for summary judgment (D.E. 58, 68), and Judge Lenard denied Plaintiff's motion but granted Defendants' motion.

**The August 3, 2017 Discovery Hearing**

Before Judge Lenard granted Defendants' summary judgment motion (on January 22, 2018), the parties appeared before the Undersigned for a discovery hearing

on August 3, 2017. The parties made certain representations at that hearing, and they took positions based on those representations.

<div align="center"><em>Plaintiff's Counsel's Representations:</em></div>

Plaintiff's counsel, Jamie Zidell, stated that a corporate representative of Defendant testified that the company had clients "on credit." [ECF No. 79, p. 35]. Mr. Zidell explained that this is "super important" because: "A company can make a sale, for example, in November of a given year on credit and give their customer 60 or 90 days to pay" and "that customer may not pay until the following year." [ECF No. 79, p. 35]. He continued to explain that "if that's the case, the amounts in the QuickBooks™ ledgers that were prepared [were] just on the 12-month January to December basis, the corporate rep . . . was never asked to prepare any type of report showing customers who were on credit." [ECF No. 79, p. 35]. If as the corporate representative admitted, "they were issuing invoices in November -- on October, November, and December, and not getting paid until the following year, then that becomes crucial for this particular case[.]"[ECF No. 79, p. 35].

The Undersigned then asked Mr. Zidell, "as a matter of law," when "a court has to decide whether a business generates $500,000 in annual revenue, does the court include in the calculation sales made in the latter part of a year when the money is not received until the early part of the following year?" [ECF No. 79, p. 36]. Mr. Zidell answered "yes," that it is included in the earlier year, and referred me to *Centeno-Bernuy*

*v. Becker Farms*, 564 F. Supp. 2d 166, 176 (W.D.N.Y. 2008), where the court held money received in the following year counts was revenue for the prior year. [ECF No. 79, pp. 36-37].

Mr. Zidell highlighted page 176, which states, "[u]tilizing the income figures set forth on the 1999 tax returns, plus the payment from Mayer Brothers for $7,002.98, which defendants concede was income for 1999, defendants exceed the $500,000 threshold[.]" [ECF No. 79, p. 38]. Mr. Zidell told me that this "method that we are talking about, about prospective payments counting for the prior year, is commonly referred to as the **rolling quarter method**." [ECF No. 79, p. 40 (emphasis added)].

Later in the hearing, Mr. Zidell again represented that, "as far as corroborating what invoices were issued during a given year compared to where -- when payment was actually made on those invoices. If it happened in a subsequent year, it would be our argument, based on our legal authority that we cited, that that *should* [count] as sales made or business done for the prior year." [ECF No. 79, p. 58 (emphasis added)].

*Defense Counsel's Representations:*

Leslie Langbein, Defendants' counsel, stated that she wanted to "straighten out some misconceptions about the law[.]" [ECF No. 79, p. 64]. Ms. Langbein then pointed to 29 C.F.R. § 779.266, which she says "allows the employer to either select a cash basis -- a fiscal year, or alternatively if you cannot figure out whether the employer meets the enterprise theory, you can use the rolling quarter method, assuming that there is a prior

year where they did meet the enterprise theory." [ECF No. 79, p. 65].

Ms. Langbein stated that § 779.266 says that "the sales records maintained as a result of the accounting procedures used for tax or other business purposes may be utilized in computing the annual dollar volume, provided the same accounting procedure is used consistently, and that such procedure accurately reflects the annual volume of sales or business." [ECF No. 79, p. 65].

Ms. Langbein then further explained that Defendants' accountant testified that "my client has consistently used a cash-basis method of accounting." [ECF No. 79, p. 66]. Ms. Langbein noted that "[t]here are IRS regulations that govern cash basis accounting, and basically it says that your annual gross income equals money that you actually received or money that you constructively received." [ECF No. 79, p. 66]. Ms. Langbein then explained that "the regulation also says if there are restrictions on the payment, and it is not readily available in the year that you receive it or the year it is actually received . . . it does not count as constructive income." [ECF No. 79, p. 67]. "So it's not the fact that my client issued an invoice between November 15th and December 31st, it's actually when they received the payment for that invoice[.]" [ECF No. 79, pp. 67-68].

Still later in the hearing, the Undersigned asked Ms. Langbein, "I thought that your principal argument out of the box is that it's legally irrelevant [to produce 2015 invoices] because our client is on a cash basis [method of accounting,]" and "therefore if

we receive money on January 9th, 2017, that's used to calculate the gross revenues for 2017, not 2016. Isn't that your primary argument?" [ECF No. 79, pp. 78-79]. Ms. Langbein said it was her position and then explained that, as a "fall back argument," if her client is required to produce the records, her client should only have to list customers' initials instead of full names as a matter of privacy. [ECF No. 79, p. 79].

Ms. Langbein repeated her point that "it doesn't really matter what was invoiced. What -- what matters is how much did they receive in payments [for that year]." [ECF No. 79, p. 90]. "I could issue an invoice on December 31st [2016], and if a customer does not pay until January 15th, it is 2017 income." [ECF No. 79, p. 92]. Additionally, Ms. Langbein noted that a "vast majority" and "99.6%" of Defendants' customers are "COD" (on a cash-on-delivery basis), so there are not "many situations where [customers] were making payments in January of a year, but the order was placed in December of the prior year." [ECF No. 79, p. 80].

The Undersigned's discovery ruling required Defendants to provide a supplemental interrogatory answer or affidavit explaining whether Abalux received payments in 2016 for invoices created in December 2015. [ECF No. 54]. It also required them to produce a list of customers (by initials only) who were invoiced in 2015 but did not make a payment or payments until 2016.

This ruling was limited to discovery and did not determine whether payments received in 2016 for 2015 invoices should in fact be used to calculate the 2015 annual

revenue, nor did it find that Abalux was properly using a cash basis method to calculate annual revenue. Those decisions were not made until Judge Lenard issued her summary judgment ruling (almost six months later, on January 22, 2018).

**The Summary Judgment Ruling [ECF No. 97]**

The primary issue in the summary judgment motions was whether Abalux's annual gross revenue was less than $500,000. Although Plaintiff's claim concerned 2014-2016, Judge Lenard determined that Plaintiff had not met his burden of establishing a genuine issue of material fact concerning Abalux's gross volume of sales or business for 2014 and 2016. Therefore, the crux of her analysis centered <u>only on 2015</u> -- and Plaintiff's contention that money received in 2016 for sales made or services rendered in 2015 had to be allocated to the evaluation of whether the annual sales in 2015 met the $500,000 jurisdictional limit.

Defendants argued that Plaintiff could not establish enterprise jurisdiction for 2015 because Abalux had less than $500,000 in annual gross volume of sales for that year. Defendants explained that Abalux used the cash-basis method for calculating gross volume of sales based on a calendar year. Plaintiff, however, insisted that the accrual method **had** to be used. But as explained below, the case law his counsel relied upon does not hold that the accrual method is *required*. Instead, the few cases he cited merely noted that the accrual method is *preferable* when payments are received in the following year. Significantly, the cash basis method is *permissible*. Because Plaintiff's

legal theory was incorrect, Judge Lenard granted summary judgment in Defendants' favor.

The FLSA "requires employers who meet its preconditions to pay workers a minimum wage and to provide overtime pay where workers exceed forty hours per week." *Polycarpe v. E&S Landscaping Serv., Inc.*, 616 F.3d 1217, 1220 (11th Cir. 2010) (citing 29 U.S.C. §§ 206(a) (minimum wage), 207(a) (overtime)). "Under [the] FLSA, an employer is required to pay overtime compensation if the employee can establish enterprise coverage or individual coverage." *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1265-66 (11th Cir. 2006). Only enterprise coverage is at issue in this case. (See Compl. ¶¶ 8, 11; Defs.' Mot. at 4).

An employer falls under the enterprise coverage section of the FLSA if it:

[1] has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and

[2] is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)[.]

29 U.S.C. § 203(s)(1)(A) (emphasis added).

As noted by Judge Lenard, Abalux conceded that it engaged in interstate commerce and employed two or more employees who handled goods and materials which moved through interstate commerce. [ECF No. 97, p. 7, n. 2].

"The annual gross dollar volume of sales made or business done of an enterprise

or establishment consists of the gross receipts from all of its sales or its volume of business done during a 12–month period." 29 C.F.R. § 779.265. That twelve-month period is typically a fiscal year (which may be a calendar year), *Flores v. Nuvoc, Inc.*, 610 F. Supp. 2d 1349, 1357 (S.D. Fla. 2008) (finding calendar year to be appropriate period); however, under certain circumstances, annual gross volume of sales may be calculated using the "rolling quarter method."[6] 29 C.F.R. § 779.266; *see also Flores*, 610 F. Supp. 2d at 1356-58. "Once either basis has been adopted it must be used in making subsequent calculations." § 779.266(b). "The sales records maintained as a result of the accounting procedures used for tax or other business purposes may be utilized in computing the annual dollar volume provided the same accounting procedure is used consistently and that such procedure accurately reflects the annual volume of sales or business." *Id.*

In the summary judgment Order, Judge Lenard held that "the undisputed facts show that Abalux's gross volume of sales or business done was <u>at most</u> $493,817.46 in 2014, and was <u>at most</u> [$457,367.44] in 2016," which then meant that "there is no enterprise coverage under the FLSA, and Defendants are entitled to summary judgment as to those years." [ECF No. 97, p. 9].

The Court then turned to 2015. The primary dispute concerned the treatment of payments received in 2016. Plaintiff argued that Abalux's 2015 gross sales calculation

---

[6]     Judge Lenard pointed out that neither party urged the applicability of the "rolling quarter method" to this case. [ECF No. 97, p. 8 n. 3].

should be increased by at least $16,527.41 (and perhaps by as much as $24,044.34) to reflect payments received in 2016 for goods sold or services rendered in 2015. (Pl.'s Facts ¶¶ 3-4, 6; Pl.'s Resp. at 4-11). However, Judge Lenard held that "Plaintiff's argument that they should be applied to Abalux's 2015 gross sales calculation is **misplaced**." [ECF No. 97, p. 10 (emphasis added)].

To reach the conclusion that Plaintiff's argument was incorrect, Judge Lenard focused on the applicable Department of Labor regulations. She noted that the "regulations expressly provide that 'sales records maintained as a result of the accounting procedures used for tax or other business purposes may be utilized in computing the annual dollar volume provided the same accounting procedure is used consistently and that such procedure accurately reflects the annual volume of sales or business.'" [ECF No. 97, pp. 10-11 (quoting § 779.266(b))].

The summary judgment Order emphasized that the undisputed facts establish that Abalux had since 2012 consistently used a **cash basis** accounting method for annual gross receipts. (Facts ¶ 10). This method allows Abalux to record a sale when the funds for the sale are actually or constructively received, **not when the invoice is created**. (Id. ¶¶ 10-11) (emphasis added).

As highlighted by Judge Lenard, Abalux elects to use the calendar year as its fiscal year so its federal corporate income tax returns were prepared based on monies it received in hand from January 1st through December 31st of each year, regardless of

when the invoices for those payments were created. (Id. ¶ 12). Therefore, any payments received in 2016 for goods sold or services rendered in 2015 were properly applied to the **2016** gross sales calculation to be consistent with prior years' accounting method. § 779.266(b).

After flagging Abalux's cash method and the consequential conclusion that payments received in 2016 were attributable to 2016 gross revenue calculations, Judge Lenard rejected Plaintiff's contention that the accrual method *had* to be used. Throughout the litigation, Plaintiff repeatedly and consistently argued that the accrual method, as opposed to the cash method, was **mandatory**.

For example, in his Motion to Overrule a Post-Hearing Discovery Order, Plaintiff argued that "payments made early in the year, for sales accomplished late in the previous years, **must** be included in such previous year's gross annual income."[7] [ECF No. 56, p. 6 (emphasis added)]. Likewise, he also argued, in the same motion that "$489 **must** be included in Defendants' 2015 gross annual income (sic) although the payment was made in 2016." [ECF No. 56, p. 4 (emphasis added)]. And he also contended "that at least $16,527.41 should be added to Defendants' gross annual income (sic) in 2015" (regarding sales in 2015 where payment was made in 2016). In the same motion, Plaintiff included an argument heading, highlighted in bold and underlined font, that

---

[7] The applicable test involves gross **revenue**, not income (i.e., "annual gross volume of sale or business done").

"Business Done in a Prior Year that was Paid in Subsequent Year, **Must** be Included in the Gross Annual Income of the Prior Year." [ECF No. 56, p. 9 (emphasis added)].

Similarly, in his motion for partial summary judgment, Plaintiff repeated those same incorrect assertions, including the topic heading in bold and underlined font and the unequivocal assertion that "those payments, if made early in the year for sales made late in the previous years, **must** be included in such previous years' gross annual income." [ECF No. 58, pp. 6, 8 (emphasis supplied)].

Plaintiff's Reply concerning his partial summary judgment motion again argued that a payment "**must** be included in Defendants' 2015 gross annual income (sic) although the payment was made in 2016" and that an additional $16,527.41 "**should** be added to Defendants' gross annual income (sic) in 2015." [ECF No. 73, p. 2 (emphasis supplied)].

Continuing with his strident position that money received in 2016 must be included in Defendants' 2015 "gross annual income (sic)," Plaintiff again repeated[8] those same arguments in his response to Defendants' summary judgment motion. [ECF No. 77, pp. 4-8].

Notwithstanding Plaintiff's often-invoked and stridently-articulated view that the accrual method was *required* (even though he relied on case law explaining that it

---

[8]    Plaintiff argued that the accrual method "should be" used and must be included or "should be added." [ECF No. 77, pp. 4-8].

was merely "preferable"), Judge Lenard found the theory to be completely unconvincing and quickly rejected it. Rather than paraphrase Judge Lenard's holding that Plaintiff's primary legal theory was flat-out incorrect, the Undersigned will simply quote it here:

> Although Plaintiff argues that it is "preferable" to use an accrual accounting method in which late payments received are applied to prior year sales figures, (Pl.'s Resp. at 6 (citing *Arilus v. Joseph A. DiEmmanuele, Jr., Inc.*, 895 F. Supp. 2d 1257, 1265 (S.D. Fla. 2012), *aff'd* 522 F. App'x 881))), **it cites to no authority holding that such a method is *required*.** To the contrary, in *Arilus*, the Eleventh Circuit affirmed the entry of summary judgment in favor of an employer that used a cash basis method of accounting. 895 F. Supp. 2d at 1264, *aff'd* 522 F. App'x 881. Moreover, several courts have concluded that a business's total gross volume of sales or business done may be determined from its tax returns. *Flores*, 610 F. Supp. 2d at 1355-56; *Stout v. St. Amour's Lawn Care*, LLC, No. 6:07—cv-1882-Orl-19UAM, 2008 WL 816818, at *2 (M.D. Fla. Mar. 25, 2008); *Lopez v. Top Chef Inv., Inc.*, No. 07-21598-CIV, 2007 WL 4247646, at *3 (S.D. Fla. Nov. 30, 2007); *Thompson v. Robinson*, No. 6:06-cv-771-Orl-19JGG, 2007 WL 2714091, at *4 (M.D. Fla. Sep. 17, 2007); *Xelo v. Mavros*, No. 03-CV-3665 (NG)(MDG), 2005 WL 2385724, at *3 (E.D.N.Y. Sept. 28, 2005); *Avila v. Lee*, No. G88-749, 1989 WL 200976, at *2 (W.D. Mich. July 13, 1989) ("While tax returns are not necessarily determinative of gross annual sales, they may be utilized by the defendant as long as the same accounting procedure is used consistently and the procedure accurately reflects the annual volume of sales or business."). **Because Defendants consistently used the acceptable cash basis method as its accounting method for annual gross receipts, payments received in 2016 for sales made or services rendered in 2015 are not included in the 2015 calculation of gross volume of sales or business done**.

[ECF No. 97, pp. 11-12 (emphasis supplied)].[9]

---

[9] Although the summary judgment Order noted that "neither Party argues that the 'rolling quarter method' is applicable to this case," Plaintiff's lead counsel, Jamie Zidell, emphasized the rolling quarter method at the August 3, 2017 discovery hearing. [ECF

## Defendants' Theory for Their Requested Sanctions Award

Defendants base their sanctions motion on several grounds: (1) Plaintiff filed the lawsuit without first contacting Defendants to see if Abalux was subject to the $500,000 per-year enterprise coverage; (2) Plaintiff's counsel did not timely respond to defense counsel's notice that Abalux did not meet the jurisdictional threshold for 2013-2015; (3) Plaintiff's counsel ignored a request to dismiss this lawsuit even after receiving copies of the face page of Abalux's 2013 and 2014 tax returns and of its monthly revenue reports for 2015; (4) Plaintiff's counsel repeatedly refused to dismiss the lawsuit after being served with several Rule 11 motions; (5) instead of dismissing the lawsuit, Plaintiff's counsel embarked on an aggressive discovery strategy; (6) Plaintiff's counsel ignored the deposition testimony of Defendants' accountant and served even more discovery; (7) Plaintiff's counsel ambushed Defendants' Rule 30(b)(6) designee at a deposition with summary charts purporting to establish that Abalux's QuickBooks™ registers were unreliable and that its 2014-2016 tax returns were inaccurate -- but those summaries, prepared by someone at Plaintiff's law firm -- were incorrect because the unknown person who prepared them "transposed certain numbers and improperly added figures in columns[;]" (8) Plaintiff's counsel argued that the accrual method of accounting was required; (9) Plaintiff's counsel used the incorrect summaries to support

No. 97, p. 8 n. 3].

the motion for partial summary judgment; (10) Plaintiff's counsel refused to withdraw the incorrect summaries even after they were provided with a declaration attesting to the inaccuracy of the summaries;[10] (11) Plaintiff's counsel improperly tried to accept an Offer of Judgment after the Court granted Defendants' summary judgment motion and entered final judgment in Defendants' favor; and (12) Plaintiff's counsel filed a motion for reconsideration, asking Judge Lenard to reconsider the Order striking Plaintiff's purported notice of acceptance of Defendants' Offer of Judgment. [ECF No. 124, pp. 1, 6-12].

## Applicable Legal Standards and Analysis Concerning Sanctions

Federal courts derive their power to sanction any attorney, law firm, or party from three primary sources: Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the inherent power of the court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 41 (1991) (discussing the court of appeals' consideration of the three sources of sanctions). Each source sanctions different conduct and a different wrongdoer.

Rule 11 governs any pleading, written motion, or other paper filed with the court, and applies equally to attorneys, law firms, and parties. Fed. R. Civ. P. 11(b). Section 1927 sanctions, on the other hand, cover more misconduct than Rule 11, though

---

[10]     According to Defendants' sanctions motion, "Plaintiff's Counsel apparently did not care that the Court might rely on false data to rule on their PSJ." [ECF No. 124, p. 19]. Defendants argued that "creating evidence to foil entry of summary judgment is the essence of bad faith." [ECF No. 124, p. 19].

the scope of sanctionable conduct often overlaps. In addition, § 1927 sanctions apply only to attorneys and others persons admitted to try cases in U.S. courts. Danielle Kie Hart, *And the Chill Goes on – Federal Civil Rights Plaintiffs Beware: Rule 11 Vis-À-Vis 28 U.S.C. § 1927 and the Court's Inherent Power*, 37 LOY. L.A. L. REV. 645, 653 (2004).[11] "[A]cts which degrade the judicial system, including attempts to deprive the Court of jurisdiction, *fraud*, misleading and lying to the Court," however, are sanctioned through the court's inherent power. *Chambers*, 501 U.S. at 41-42 (internal quotation omitted and emphasis added). In fact, "the wielding of that inherent power is particularly appropriate when the offending parties have practiced a fraud upon the court." *Id.* at 42.

Defendants' motion seeks sanctions under all three legal theories: Rule 11, § 1927, and the Court's inherent power. [ECF No. 124]. Judge Lenard referred the motion to the Undersigned, Plaintiff filed a response, and Defendants filed a reply. [ECF Nos. 125; 139; 142].

On the same day that Plaintiff filed his response opposing the sanctions motion, he filed his own "Motion for Sanctions Against Defense Counsel" -- for filing the

---

[11]     United States District Judge Marcia G. Cooke cited this law review article in *Stonecreek – AAA, LLC v. Wells Fargo Bank, N.A.*, No. 1:12-cv-23850, 2014 WL 12514900, at *1 (S.D. Fla. May 13, 2014), where the Court, after an evidentiary hearing, granted the defendant bank's motion to dismiss and for sanctions and dismissed the case with prejudice. The sanction was awarded because the plaintiff fabricated evidence, a scenario which Judge Cooke deemed to be a fraud upon the Court. Specifically, the Court determined that signatures on two critical documents were forged.

sanctions motion in the first place (and for her so-called "habit of seeking sanctions unsuccessfully against opposing counsel, particularly the Undersigned Firm, in an apparent attempt to drive up and seek attorneys' fees"). [ECF No. 140]. One day later, Judge Lenard entered an Order denying Plaintiff's cross-motion for sanctions without prejudice. [ECF No. 141]. In that Order, Judge Lenard observed that Plaintiff's motion does not explain why Defendants' sanctions motion is frivolous, noted that there has been no finding in that regard, and allowed Plaintiff's counsel to seek sanctions on those grounds "if this Court ultimately finds Defendant[s'] Counsel's Motion for Sanctions to be frivolous." [ECF No. 141].

Regardless of whether a sanctions motion is based on Rule 11, § 1927, or the Court's inherent power, there is tension inherent in the two scenarios underlying an attorney's representation of a client in a lawsuit: an attorney's zealous advocacy (on the one hand) and (on the other hand) efforts to pursue claims even if they are not adequately supported by the facts and law. Courts in this district often acknowledge this tension. *See, e.g., Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, No. 09-60351, 2011 WL 4433570, at *5 n.7 (S.D. Fla. Sept. 21, 2011) ("An attorney should not equate the pursuit of zealous advocacy with the zealous pursuit of the dubious ends of clients by relentlessly advancing whatever marginally, colorable claim that might exist."); *Carlson v. Bosem*, No. 04-61004-CIV, 2007 WL 1496693, at *5 (S.D. Fla. Apr. 9, 2007), *aff'd*, 298 F. App'x 861 (11th Cir. 2008) ("While the law may demand zealous advocacy on the part

of an attorney, it cannot condone attorneys demeaning themselves and the judicial process[.]"); *cf. Tobinick v. Novella*, 207 F. Supp. 3d 1332, 1344 (S.D. Fla. 2016) ("The Court is mindful that it should not punish counsel under § 1927 merely for zealous advocacy or for being on the losing side of a case.").

The rules governing sanctions under Rule 11, § 1927, and the Court's inherent power are not identical but they are straightforward.

The determination of whether a party or attorney has violated Rule 11(b) rests within the discretion of the district court. *Thompson v. RelationServe Media Inc.*, 610 F.3d 628, 637 (11th Cir. 2010).

Rule 11(b) provides that, by presenting to the court a pleading, written motion, or other paper -- whether by signing, filing, submitting, or later advocating it -- an attorney certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information

Fed R. Civ. P. 11(b)(1)–(4). Thus, under Rule 11, an attorney must make some reasonable inquiry into the facts and the law.

A court confronted with a motion for Rule 11 sanctions premised on the alleged frivolity of a claim must first determine whether the party's claims or assertions are objectively frivolous in view of the facts or law; if they are, then the court must determine whether the person who signed the pleadings would have been aware that the claims or assertions were frivolous had he or she made a reasonable inquiry. *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996). An objective standard of reasonableness governs both inquiries. *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998); *Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir. 1987) (*en banc*); *see also Worldwide Primates*, 87 F.3d at 1254 (noting that reasonableness of the inquiry is a fact-based question, dependent on the circumstances of the case at hand).

Defendants, as the parties seeking sanctions, must establish both elements, and the Court must resolve all doubts in Plaintiff's favor. *Pharma Supply, Inc. v. Stein*, No. 14-80374-Civ-Cohn, 2015 WL 11439276, at *1 (S.D. Fla. May 27, 2015) (citing *McMahan Sec. Co. L.P. v. FB Foods, Inc.*, No. 8:04-1791-T-24TGW, 2006 WL 2092643, at *2 (M.D. Fla. July 27, 2006)). If the Court does find both elements present, then it has the discretion to decide whether to impose sanctions and the kind of sanctions it may order. *Thompson*, 610 F.3d at 666; Fed. R. Civ. P. 11(c)(1) ("the court *may* impose an appropriate sanction") (emphasis supplied); Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment

("The court has significant discretion in determining what sanctions, if any, should be imposed for a violation[.]").

A legal claim is frivolous if no reasonably competent attorney could conclude that it has any reasonable chance of success or is a reasonable argument to change existing law. *Worldwide Primates,* 87 F.3d at 1254 (citing *Jones v. Int'l Riding Helmets, Ltd.,* 49 F.3d 692, 694 (11th Cir. 1995)); *see also Davis v. Carl,* 906 F.2d 533, 538 (11th Cir. 1990) (noting that legal claims are objectively frivolous when they ignore clearly established law).

A factual claim is frivolous if no reasonably competent attorney could conclude that it has a reasonable evidentiary basis, because it is supported by no evidence or only by "patently frivolous" evidence. *Davis,* 906 F.2d at 535–37. When, however, the evidence supporting a claim is reasonable, but only weak or self-serving, sanctions cannot be imposed. *Thompson,* 610 F.3d at 665 (Tjoflat, J., concurring) (citing *Davis,* 906 F.2d at 536).

Rule 11 sanctions are appropriate when an attorney knowingly continues to litigate a matter or an issue after it becomes clear that there is no good faith basis in law or fact for the action or position. The same conduct is proscribed by § 1927. *Avirgan v. Hull,* 932 F.2d 1572, 1582 (11th Cir. 1991) (citing *Collins v. Walden,* 834 F.2d 961, 965 (11th Cir. 1987) ("When it becomes apparent that discoverable evidence will not bear out the

claim, the litigant and his attorney have a duty to discontinue their quest.")).[12]

Section 1927's purpose is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs bear them. *Roadway Express v. Piper*, 447 U.S. 752, 762 (1980). To impose sanctions under this statute: (1) the attorney must engage in unreasonable and vexatious conduct; (2) that conduct must multiply the proceedings; and (3) the amount of the sanction must bear a "financial nexus to the excess proceedings." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997).

The standard for imposing sanctions under § 1927 turns on the attorney's objective conduct as compared to how a reasonable attorney would have acted under the circumstances. *Norelus*, 628 F.3d at 1282. Objectively reckless conduct is sufficient to justify sanctions under § 1927 even if the attorney does not act knowingly and malevolently. *Id.* at 1291.

In *Amlong & Amlong, P.A. v. Denny's Inc.,* 500 F.3d 1230 (11th Cir. 2007), the Eleventh Circuit "observed that a district court's authority to issue sanctions for attorney misconduct under § 1927 is either broader than or equally as broad as the district court's authority to issue a sanctions order under its inherent powers." *Id.* at

---

[12] The *Collins* Court explained that an attorney whose reasonable search of the discovery reveals "the impossibility of success" is "under an absolute duty to refuse to litigate the case" because Rule 11's "mandate" prohibits the filing of "factually groundless complaints." 834 F.2d at 965.

1239 (citing *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1178 n.6 (11th Cir. 2005)). The

Eleventh Circuit further explained,

> [i]f the sanctions were permissible under § 1927, then they were proper,
> and there is no need to examine whether the sanctions were also
> permissible under the court's inherent powers. On the other hand, if the
> sanctions amounted to an abuse of the district court's discretion under §
> 1927, they necessarily amounted to an abuse of the court's discretion
> under its inherent powers, because the court's inherent power to issue
> sanctions for vexatious conduct by attorneys does not reach further than §
> 1927.

*Id.*

But as noted by Plaintiff in his opposition response, there is a significant

distinction between Rule 11 and § 1927 because the rule provides a 21-day safe harbor

period to make the appropriate corrections, while the statute does not provide a safe

harbor period for implementing a remedy. Moreover, courts have noted other

differences between the rule and the statute. *Chambers*, 501 U.S. at 47 (noting that Rule

11 permits attorney's fees "for conduct which merely fails to meet a reasonableness

standard," in contrast to a court's inherent powers, which require a higher showing

before imposing sanctions); *SEC v. Creative Capital Consortium, LLC*, No. 08-81565, 2009

U.S. Dist. LEXIS 116312, at *13 (S.D. Fla. Nov. 24, 2009) (internal citations omitted)

(noting that the Court's inherent powers should be exercised "with restraint and

discretion").

Because § 1927 mentions "attorneys" and because Defendants seek a fee award

against both individual attorneys and their law *firm,* the Court needs to determine

whether § 1927 authorizes sanctions against law firms. The Court has not found an Eleventh Circuit case directly on point. Although there is a case that mentions, in passing, that a fee sanction may be awarded against "litigants, counsel and law firms who willfully abuse judicial process by conduct tantamount to bad faith," in that case, the Eleventh Circuit did not directly discuss at all the issue of whether § 1927 applies to law firms and it does not appear as though any appellant even raised the issue in the first place. *Avirgan*, 932 F.2d at 1582.

Other federal appellate courts have tackled the issue head on and concluded that the statute does **not** apply to law firms. *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 750–752 (6th Cir. 2010); *Claiborne v. Wisdom*, 414 F.3d 715, 722–724 (7th Cir. 2005). At bottom, these appellate courts focused on the specific use of the term "attorney" in the statute and the fact that law firms are not "admitted" to "conduct cases" in federal courts. They also analogized to the rationale in *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989), where the Supreme Court considered the question of whether sanctions were proper against a law firm under an earlier version of Rule 11. In *Pavelic*, the Supreme Court construed language permitting sanctions only against the "person who signed" the offending document and determined that the language could only refer to the individual signer, not to his partnership. *Id.* at 127.

Based on these authorities and the Court's own assessment of the language in § 1927, the Undersigned concludes that the statute either cannot be used to support an

award of fees against J.H. Zidell, P.A., the Plaintiff's law firm here, or should not be used for that purpose. *See also Sangui Biotech Int'l, Inc. v. Kappes,* 179 F. Supp. 2d 1240, 1244–45 (D. Colo. 2002) (holding that statute did not apply to law firms, and noting that the statute indicates that an attorney may be required to "satisfy personally" any award, and also emphasizing that the duties imposed by the statute are not delegable).

But under its *inherent powers,* a court can sanction both an attorney and the attorney's law firm for bad faith litigation conduct. *Spolter v. Suntrust Bank,* 403 F. App'x. 387, 391 (11th Cir. 2010) (affirming award of fees against individual lawyer and his law firm pursuant to the court's inherent powers); *In re Mroz,* 65 F.3d 1567, 1576 (11th Cir. 1995) ("there is nothing preventing a federal court from exercising its inherent power to sanction an attorney, a party, or a law firm for their subjective bad faith") (internal citation omitted); *Maale v. Kirchgessner,* No. 08–80131–CIV, 2011 WL 1458147, at *4 (S.D. Fla. Apr. 15, 2011) (awarding sanctions against attorney and his former law firm, jointly and severally, based upon the Court's inherent power); *Herard v. ATN Rest., Inc.,* No. 07–60269–CIV, 2008 WL 123596, at *5 (S.D. Fla. Jan. 8, 2008) (awarding fees against plaintiff's law firm in FLSA case under inherent power doctrine).

Courts have inherent power to levy sanctions against litigants for abuse of the judicial system even if procedural rules also exist that sanction the same conduct. *Chambers,* 501 U.S. at 49; *In re Mroz,* 65 F.3d at 1573-75; *Malautea v. Suzuki Motor Co.,* 987 F.2d 1536, 1546 (11th Cir. 1993). One aspect of a court's inherent power is the ability to

assess attorney's fees and costs against the client or his attorney, or both, when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45-46. (internal quotations omitted).

But "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (citing *In re Mroz*, 65 F.3d at 1575).

## Magistrate Judge Jurisdiction For Sanctions Motions: An Order or a Report?

Magistrate judges may issue an order on any "pretrial matter not dispositive of a party's claim or defense." Fed. R. Civ. P. 72(a). Such an order may not be set aside unless it "is clearly erroneous or is contrary to law." *Id.* Thus, magistrate judges have jurisdiction to enter sanctions orders for discovery failures that do not strike claims, completely preclude defenses, or generate litigation-ending consequences. Practice Before Federal Magistrates, § 16.06A (Mathew Bender 2010) ("discovery sanctions are generally viewed as non-dispositive matters committed to the discretion of the magistrate unless a party's entire claim is being dismissed").

To determine whether a sanction is dispositive or non-dispositive, the critical factor is what sanction the magistrate judge *actually imposes*, rather than the one *requested* by the party seeking sanctions. *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995) (rejecting argument that magistrate judge ruled on dispositive motion because litigant sought entry of a default judgment and explaining that "[e]ven though a movant requests a sanction that would be dispositive, if the magistrate judge

does not impose a dispositive sanction," then the order is treated as not dispositive under Rule 72(a)); Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 3068.2, at 342-44 (West 1997).

Federal magistrate judges in this Circuit[13] frequently enter orders in cases where parties seek sanctions, including default judgments or dismissals, for spoliation. *See, e.g., Atlantic Sea Co., S.A., v. Anais Worldwide Shipping, Inc.*, No. 08-23079-CIV, 2010 WL 2346665 (S.D. Fla. June 9, 2010) (Brown, J.); *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317 (S.D. Fla. 2010) (O'Sullivan, J.); *Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2009 WL 3823390 (S.D. Fla. Nov. 16, 2009) (Rosenbaum, J.).

Indeed, federal magistrate judges in Florida have entered orders imposing

---

[13]     Federal magistrate judges in other circuits routinely enter similar types of orders when the effect is not similar to a default judgment or does not preclude a defense. *See Moore v. Napolitano*, 723 F. Supp. 2d 167, 183-84 (D.D.C. 2010) (rejecting the argument that the magistrate judge entered a "severe sanction akin to a litigation-ending default judgment" and affirmed the magistrate judge's order precluding the defendant from offering any legitimate, nondiscriminatory reason to rebut any *prima facie* case of disparate treatment discriminatory non-promotion of the individually named plaintiffs in an employment discrimination case); *Carmona v. Wright*, 233 F.R.D. 270, 276 (N.D.N.Y. 2006) (finding that magistrate judges are permitted to enter sanctions orders for discovery violations because they are "generally non-dispositive matters" unless the order imposes a sanction which "disposes of a claim; e.g., striking pleadings with prejudice or dismissal"); *Exxon Corp. v. Halcon Shipping Co. Ltd.*, 156 F.R.D. 589, 590 (D.N.J. 1994) (finding that magistrate judge's order precluding expert witness from testifying as a sanction for violation of a pretrial discovery order was reviewed under the clearly erroneous or contrary to law standard of review); *cf. San Shiah Enter. Co., Ltd. v. Pride Shipping Corp.*, 783 F. Supp. 1334 (S.D. Ala. 1992) (finding that magistrate judge was authorized to impose Rule 11 sanctions).

adverse inferences and attorney's fees as sanctions in spoliation scenarios. *Preferred Care*

*Partners Holding Corp. v. Humana, Inc.*, No. 08-20424-CIV, 2009 WL 982460, at *8 (S.D. Fla.

Apr. 9, 2009) (Simonton, J.) (awarding **costs and fees** for "grossly negligent discovery

conduct" leading to the destruction of emails when bad judgment, but not bad faith,

was responsible for the errors); *Optowave Co., Ltd. v. Nikitin*, No. 6:05-cv-1083-Orl-

22DAB, 2006 WL 3231422 (M.D. Fla. Nov. 7, 2006) (Baker, J.) (imposing adverse

inference jury instruction based on intentional failure to produce highly relevant

emails).

Similarly, magistrate judges have authority to impose sanctions for violations

other than those arising in spoliation scenarios. *See, e.g., Maisonville v. F2 Am., Inc.*, 902

F.2d 746, 747 (9th Cir. 1990) (finding that Rule 11 sanctions are non-dispositive matters

"properly ordered by the magistrate and reviewed by the district court for clear error");

*Avendano v. Sec. Consultants Grp.*, 302 F.R.D. 588 (D. Nev. 2014) (ruling on non-

dispositive Rule 11 and § 1927 sanctions motions); *Toth v. Alice Pearl, Inc.*, 158 F.R.D. 47

(D.N.J. 1994) (Rule 11 sanctions); *Scotch Game Call Co., Inc. v. Lucky Strike Bait Works, Ltd.*,

148 F.R.D. 65 (W.D.N.Y. 1993) (sanctions under § 1927); *San Shiah Enter. Co., Ltd. v. Pride*

*Shipping Corp.*, 783 F. Supp. 1334 (S.D. Ala. 1992) (Rule 11 sanctions).

**The *Rodriguez v. Marble Care* Case (and other cases awarding sanctions)**

In determining whether a legal claim or factual contention is objectively frivolous

for Rule 11 purposes, the Court may consider whether the litigant or his counsel has a

history of bringing unmeritorious litigation. *Cf. Bilal v. Driver*, 251 F.3d 1346, 1350 (11th Cir. 2001), *cert. denied*, 534 U.S. 1044 (2001) (noting that district court "was all too familiar with Plaintiff's repetitive and trifling litigation tactics"); *Petrano v. Nationwide Mut. Fire Ins. Co.,* No. 1:12-cv-86, 2013 WL 1325201, at *6 (N.D. Fla. Feb. 4, 2013) (same). Therefore, the Undersigned deems it relevant to consider other cases assessing sanctions against the Zidell firm and/or its attorneys. As it turns out, there are *several* of them. I am most familiar with one of them, the *Marble Care* case, because I entered a sanctions Order in that case.

A few years before filing the instant case against Abalux, the Zidell law firm filed an FLSA lawsuit on behalf of another client against another defendant -- and were sanctioned for pursuing the lawsuit even though they lacked evidence that the defendant's gross annual sales volume exceeded the jurisdictional hurdle of $500,000. Specifically, in *Rodriguez v. Marble Care International, Inc.,* 863 F. Supp. 2d 1168 (S.D. Fla. 2012), the Zidell law firm, on behalf of its client, sued a small, local floor finisher. The plaintiffs there were basic laborers, doing floor polishing, and worked for approximately two to six months during 2010.

The District Court granted summary judgment for Defendants in *Marble Care* because the plaintiffs did not establish the minimum $500,000 annual-sales/revenue requirement for enterprise FLSA coverage. The Undersigned entered an initial Report and Recommendations on the defendants' motion for attorney's fees and sanctions and

then issued a Supplemental Report. The Supplemental Report was issued because the plaintiffs contended that the District Court had not specifically referred the attorney's fees motion to the Undersigned, so the District Court specifically referred it, causing me to then issue a Supplemental Report. The District Court ratified, affirmed, and approved the Supplemental Report in its entirety. 863 F. Supp. 2d at 1171. The Court entered a fee award as a sanction because they "**persisted in prosecuting the claim** even though they never had the necessary evidence to establish FLSA jurisdiction and **ignored unrebutted evidence** demonstrating that Marble Care was not subject to the FLSA claim." *Id.* at 1182 (emphasis in original).

Other judges in this district have also entered sanctions against the firm and its attorneys or have expressed extreme frustration and disappointment with their tactics. In addition to the *Marble Care* case, there are least five other cases which can be considered:

1.  *Estrada v. FTS USA, LLC*, No. 14-23388, 2018 WL 1836007, at **5-6 (S.D. Fla. Jan. 23, 2018) (sanctioning Mr. Zidell and his law firm for pursuing the incorrect allegation that their plaintiff client was "*never* paid" the required overtime rate without making any inquiry into the accuracy of that false claim before filing suit).

2.  *Silva v. Pro Transport, Inc.*, No. 15-23028, 2017 WL 2189620, at *2 (S.D. Fla. May 18, 2017) (ordering Mr. Zidell and his client to pay all the reasonable attorney's fees and costs incurred by the defendants since the start of the FLSA lawsuit "for

misrepresentations to the Court and failure to conduct even a *de minimus* inquiry into the facts or law informing this case").

3.      *Aguilar v. United Floor Crew, Inc.*, No. 14-civ-61605, 2015 WL 2415421, at *12 (S.D. Fla. May 21, 2015) (dismissing lawsuit with prejudice because the plaintiff repeatedly and willfully misidentified himself to the Court, counsel did not conduct any inquiry of their own, and "it also bears noting that counsel for Plaintiff are no strangers to discovery sanctions and Rule 41(b) dismissal").

4.      *Gonzalez v. Bus. Representation Int'l, Inc.*, 248 F.R.D. 644, 645, 647 (S.D. Fla. 2008) (finding that the plaintiff, who was represented by the Zidell firm, engaged in obstruction and denied access to discoverable evidence, which resulted in a Rule 41(b) dismissal).

5.      *Medina v. 3C Constr. Corp.*, No. 02-23090, 2006 WL 8434953 (S.D. Fla. Oct. 27, 2006), *report and recommendations adopted*, 2007 WL 9706352 (S.D. Fla. May 18, 2007) (ordering Mr. Zidell to pay defense attorney's fees as a sanction under § 1927, because he "acted recklessly by preparing false [interrogatory] responses" for approximately 20 of his clients).

**The Rule 11 Motions**

Defense counsel's first Rule 11[14] motion explained that defense counsel provided

---

[14]     All Rule 11 motions also sought relief under § 1927 and the Court's inherent authority. References in this Order to Rule 11 motions also refer to the other theories of

Plaintiff's attorneys with copies of tax returns and sales tax reports to "prove the lack of jurisdiction" and requested dismissal of the lawsuit -- a request which was not granted. It also noted that Plaintiff's counsel advised of their intent to proceed and, instead of dismissing the lawsuit, to take the deposition of Abalux's accountant. The motion alleged that Plaintiff's counsel were "mimicking the sanctionable missteps in the *Rodriguez* case" and continued to litigate the jurisdictional issue "in the face of sworn tax documents and statements which show there is no basis in fact or law to find coverage under the FLSA."

Defendants' first Rule 11 motion[15] noted that Plaintiff's responses to discovery propounded by Defendants "clearly showed" that "he had no information to contradict the Corporate Defendants' tax returns and the Florida Department of Revenue DR-15 sales reports." This motion contended that Plaintiff and his law firm continued to take

relief mentioned in those motions. All of Defendants' Rule 11 motions that were served on Plaintiff are contained in ECF No. 124-4 as one composite exhibit.

[15]     It is difficult to determine exactly when each Rule 11 motion was served. The purported dates of service mentioned in the actual sanctions motion do not always correspond to the dates listed in the certificates of service at the end of each version of the motion. For example, the first motion lists a service date of April 20, 2016 [ECF No. 124-4, p. 8], but the seventh motion [ECF No. 124-4, p. 82], which purports to list all the service dates for all versions of the motion, shows February 24, 2017 as the first service date (and lists re-service dates of March 9, 2017; May 16, 2017; June 5, 2017; July 7, 2017; August 3, 2017; and "9/1917," which could be September 19, 2017 (though that would be only an educated guess). Nevertheless, it appears as though seven motions were filed, with each motion including the developments since the earlier version of the motion. Thus, the first motion was seven pages long and the seventh motion was 18 pages long.

discovery, including the depositions of a Rule 30(b)(6) corporate representative, the individually named Defendant, and the corporate Defendant's accountant.

Defendants' fourth renewed motion mentioned that Plaintiff still refused to dismiss the case and to cancel depositions, a decision that "will cause Defendants to incur even more attorney's fees and costs."

Defendants' fifth renewed Rule 11 motion explained that on April 19, 2017, Plaintiff took the deposition of Defendants' accountant, who provided a full copy of Abalux's 2016 income tax return, which had been provided a few days earlier. It also noted that the accountant confirmed that the company's annual gross sales were less than $500,000 between 2012 and 2016 and Abalux's use of the cash basis method of accounting. According to the motion, Plaintiff's law firm "still refused to dismiss the lawsuit and insisted that Abalux produce its bank statements for the years 2012 and 2016."

Defendants' sixth renewed sanctions motion noted that on June 12, 2017, the Court ordered Abalux to produce copies of its QuickBooks™ register for the years 2014, 2015, and 2016. It did not, however, require Abalux to produce the 2013 register because the sales were so low that it would be impossible to find revenue that would place Abalux at or over the $500,000 threshold for enterprise coverage. The motion also explained steps Abalux had taken on August 3, 2017: serving Plaintiff's counsel with QuickBooks™ reports showing its monthly income for 2014-2016, a compilation of the

sales taxes it had paid to the State of Florida during those years, sample invoices showing that sales tax was separately stated on customer invoices, and a request to immediately dismiss the case.

Defendants' seventh renewed sanctions motion summarized the events outlined above and also noted that Plaintiff's counsel filed a motion for partial final summary judgment on August 25, 2017 that "argued the accrual method of accounting should apply to Abalux's gross volume of sales despite citing cases that expressly permitted a business to use the cash basis method of accounting."

According to Defendants, Plaintiff's partial summary judgment motion (1) was based on the inaccurate "summaries;" (2) failed to cite 29 C.F.R. § 779.265; (3) misquoted the holding in *Arilus v. DiEmmanuele*,[16] 895 F. Supp. 2d 1257 (S.D. Fla. 2012), *aff'd* 522 F. App'x. 881 (11th Cir. 2013); and (4) purported to expressly reserve the right to continue discovery concerning Abalux's gross sales for the years 2013, 2014, and 2016.

The seventh renewed motion also explained that on September 14, 2017, Defendants responded to the motion for partial summary judgment and "highlighted

---

[16]    In that case, the trial court granted summary judgment to the defendants after noting that they used the cash basis accounting system and "therefore report income/receipts at whatever time such funds are collected instead of the time at which the business is conducted." *Id.* at 1264. On appeal, the Eleventh Circuit provided the following rationale about the accounting system: "Because the employers use the cash basis of accounting, which records cash payments on the day they are received instead of the day the sale is made or the business is done, the 2006 tax returns included receipts for business that was actually done in 2005" -- but "[t]hat does not make the tax returns 'fraudulent.'" 522 F. App'x. at 884.

that the Eleventh Circuit had accepted the cash basis method of accounting and that DOL regulations allowed a business to make that choice." The motion further noted that Defendants' response to the Plaintiff's partial summary judgment motion included a declaration showing that Plaintiff's counsel's charts "were based on transposed numbers and faulty calculations" and case law which held that Plaintiff's counsel's "reliance on the $508,518.69 was both legally and factually unjustified."

This final Rule 11 motion served by Defendants noted that Plaintiff's counsel's intransigence forced them to file their own summary judgment motion on September 18, 2017. In their final Rule 11 motion, Defendants contended that Plaintiff's counsel persisted in asserting the claim by "re-arguing that the accrual method of accounting ought to apply."

### The Offer of Judgment

Defendants incurred additional legal fees based on Plaintiff's counsel's refusal to concede that they lacked facts, case law, and administrative regulations to support their theories. Abalux was forced to prepare a joint pre-trial stipulation, witness and exhibit lists, and jury instructions. [ECF Nos. 88-89]. On January 17, 2018, fourteen days before the pre-trial conference, Abalux served an Offer of Judgment as a last ditch effort to end the litigation.

Five days later, the Court denied Plaintiff's partial summary judgment motion, granted Defendants' summary judgment motion, and entered final judgment in

Defendants' favor. [ECF Nos. 97-98]. Plaintiff's counsel then tried to accept the Offer of Judgment on January 26, 2018, despite case law holding that a court's entry of a final judgment invalidates an offer of judgment. [ECF No. 99]. Defense counsel immediately emailed Plaintiff's counsel and demanded that he withdraw the acceptance and explained why it was invalid. Plaintiff's counsel refused. On January 27, 2018, defense counsel spent legal time researching and drafting a motion to strike to invalidate the acceptance. She conferred twice more with Plaintiff's counsel before filing the motion.

In the interim, the Court issued its own order striking the notice of acceptance. [ECF No. 101]. Yet Plaintiff's counsel still refused to concede and filed a motion for reconsideration based on "clear error." [ECF No. 102]. Abalux drafted a response. [ECF No. 104]. The Court denied the motion for reconsideration. [ECF No. 108]. [17]

The Undersigned will assess the challenged conduct on an issue-by-issue basis, grouped into categories.

### Filing the Lawsuit without First Contacting Defendants

Defendants contend that Plaintiff's counsel should have contacted them before filing the lawsuit to confirm that the $500,000 jurisdictional threshold had been met for

---

[17] Plaintiff's counsel contend that the Offer of Judgment scenario cannot be the basis for a Rule 11 motion because Defendants never cited the Offer of Judgment in the Rule 11 motions they served but did not file. [ECF No. 139, pp. 16-17]. They say Rule 11 requires that the Rule 11 motion, which ultimately gets filed, must be the same one as the proposed motion that had been served earlier. Even if this point is legally correct, it would not preclude a request for sanctions under § 1927 or the Court's inherent power.

each of the years in question.

If egregious enough, then pursuing a claim "without reasonable inquiry into the underlying facts" can constitute the bad faith necessary to support a fees sanction. *Barnes,* 158 F.3d at 1214  (affirming fee award against the plaintiffs' counsel under court's inherent powers for bad faith pursuit of allegedly frivolous employment discrimination claim) (internal citation omitted); *see also Dent v. Giaimo, D.O., P.A.,* 665 F. Supp. 2d 1295, 1305 (S.D. Fla. 2009) (awarding sanctions against the plaintiff's counsel in an FLSA case for not making adequate inquiry into facts before filing the lawsuit because "such inaction is tantamount to bad faith"); *Ortiz v. D & W Foods, Inc.,* 657 F. Supp. 2d 1328, 1330–31 (S.D. Fla. 2009) (awarding fees against the plaintiff's counsel in an FLSA case and noting that the pre-suit investigation did not concern the $500,000 gross revenue threshold issue).

*Worldwide Primates* is certainly binding authority requiring an attorney, under Rule 11, to make a reasonable inquiry into both the legal and factual basis of a claim prior to filing suit. It also holds that, absent extenuating circumstances, "an attorney cannot simply rely on the conclusory representations of a client, even if the client is a long-time friend." 87 F.3d at 1255.

*Ortiz* also provides support for Defendants' request to award fees based solely on the failure of Plaintiff's counsel to engage in a pre-suit inquiry into enterprise coverage. 657 F. Supp. 2d at 1330–31.

An award based on counsel's pre-filing failure to research and investigate Abalux's annual revenues might be justified. However, the Undersigned views a pre-filing request for information about an employer's annual revenues to, in certain cases, be different than a request for information about whether an employee received overtime pay or was employed during certain time periods. The second category of information is relatively straightforward and a pre-filing inquiry can likely generate a response quickly and without generating much factual dispute. For example, a copy of a check stub showing that an employee was in fact paid overtime would, or should, quickly put to rest the allegation (like in *Estrada*) that an employee "never" received overtime pay. 2018 WL 1836007, at **5-6.

On the other hand, a pre-filing request for information about revenues might trigger a less-than-comprehensive response (because it could require disclosure of personal financial information, such as corporate income tax returns) and could also cause Plaintiff's counsel to demand additional information to confirm the legitimacy of the reported revenues.

So the Undersigned acknowledges that Rule 11 sanctions could be legally entered in an FLSA case if an attorney took no pre-filing steps to determine whether the employer meets the $500,000 annual revenue jurisdictional minimum and later learns (after filing suit) that the defendant employer does not have the requisite annual revenue. But I am adopting a cautious approach here and not classifying the pre-filing

failure to ask Abalux about its annual revenues as a Rule 11 violation.

First, I note the practical reality that the two law firms have a long and troubled history of acrimony. The Undersigned is aware of several sanctions motions that the two law firms have filed against each other. Second, the Undersigned has reviewed myriad emails in which attorneys in these two firms have acted unpleasantly. And third, and perhaps most importantly, neither law firm trusts the other.

Thus, a pre-filing effort to learn whether the jurisdictional threshold had been met would likely have generated little relief. If Plaintiff's counsel had contacted Defendants with a demand letter, then Defendants would have contacted their own attorney. And if defense counsel had advised Plaintiff that the $500,000 jurisdictional hurdle had not been cleared for any of the years at issue, then it is difficult, if not impossible, to imagine a scenario where Plaintiff's counsel would have immediately and automatically accepted that response at face value and foregone the lawsuit.

At a minimum, Plaintiff's counsel would have demanded the production of income tax returns, bank records, affidavits, and other documentary evidence to corroborate the no-jurisdiction position. There is no telling whether Abalux would have complied with such a demand before the filing of a lawsuit, but it is easy to imagine a multi-month dispute over backup documentation and a subsequent failure to convince Plaintiff's counsel that the no-jurisdiction representations were accurate. Similarly, a pure bill of discovery would have generated the same information that Plaintiff's

counsel viewed as warranting further probing through discovery.

If pre-filing discovery had revealed that Abalux's annual revenues had been $100,000, for example, then an aggressive discovery campaign would likely have not been justified. But the sales figures provided for the years in question were significantly closer to the $500,000 threshold.

Under these circumstances (which are unique to the attorneys involved in this case and their atypically unpleasant and distrustful relationship), the Undersigned is reluctant to conclusively brand Plaintiff's counsel's failure to ask for pre-lawsuit discovery to be sanctionable conduct under any of the three theories proffered. But, as noted above, *Worldwide Primates* and its progeny provide the legal grounds to justify a different conclusion (of awarding a greater amount of sanctions, dating back to an earlier point in the case, because of the Zidell law firm's failure to inquire into Abalux's revenues before filing the lawsuit).

Indeed, the Eleventh Circuit has already noted that the "abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach." *Norelus*, 628 F.3d at 1280. The *Norelus* decision explained that "under an abuse of discretion standard there will be circumstances in which we **affirm** the district court **whichever way it went."** *Id.* (emphasis supplied) (internal quotation omitted); *see also Young Apartments, Inc. v. Town of Jupiter, Fla.*, 503 F. App'x. 711, 724-25 (11th Cir. 2013) (affirming district court's § 1927 sanctions award of more than $82,000 in attorney's fees

against two attorneys who represented the plaintiff in a federal civil rights lawsuit because counsel had not carried its burden of demonstrating an abuse of discretion).

### Disagreeing With Defendants' No-Jurisdiction Position on the Purported Facts

According to defense counsel, she advised Plaintiff's counsel that Abalux did not meet the $500,000 threshold for enterprise coverage in 2013, 2014, and 2015. When they failed to respond, she emailed them copies of the face page of the company's 2013 and 2014 tax returns and the monthly revenue reports for 2015. Those documents showed gross sales of $368,017 in 2013, $487,007 in 2014 and $479,406 in 2015. Defense counsel demanded dismissal of the lawsuit, a request that was ignored.

For 2014 and 2015, this initial position is close to the $500,000 threshold, and the Undersigned cannot conclude that Plaintiff's counsel acted in bad faith by not immediately dismissing the lawsuit or by pursuing discovery.

Defendants also fault Plaintiff's counsel for their failure to accept their representation that Abalux used a cash basis method of accounting, a position reflected in the company's income tax returns and in the deposition testimony of its accountant. They also brand as bad faith the ongoing strategy to obtain more and more discovery about the company's revenues, tax treatment, customers, and financial business practices.

There is no doubt that Plaintiff's counsel pursued an aggressive discovery strategy and propounded myriad discovery requests on Defendants. Some of those

discovery requests led to discovery hearings before the Undersigned. I did permit Plaintiff to obtain some additional discovery (while denying other discovery purportedly relevant to the $500,000 jurisdictional threshold).

However, Plaintiff ultimately sought partial summary judgment for 2015 and opposed Defendants' summary judgment motion for only that year.

Moreover, Defendants' discovery responses were far from error-free, and the inconsistency arguably justified Plaintiff's failure to simply accept the representations about Abalux's revenues and financial protocols. For example, Defendants had a temporary employee who failed to correct a formula in the accounting spreadsheets. As a result, Abalux had to correct its 2015 figures for total annual sales volume and amend its 2015 corporate income tax return. [ECF No. 68, p. 7 n.3].

Plaintiff's counsel also point to inconsistent and confusing deposition testimony from Abalux's accountant to support their tenacious discovery approach. Specifically, they note that the accountant said, in his first deposition, that he relied exclusively on Defendants' QuickBooks™. However, he also said that he discarded the QuickBooks™ records. Therefore, Plaintiff's counsel emphasize that they could not question the accountant about QuickBooks™. In addition, when asked about dates relating to unpaid debts, the accountant referred to QuickBooks™, which he earlier said he had discarded. During the deposition, the accountant did not know if Abalux maintained the QuickBooks™.

Similarly, Plaintiff's counsel contend that the figures provided by Defendants' administrative employee cannot be trusted. They say her affidavits did not appear to differentiate between retail and wholesale sales. They stress the following points:

> Defendant's 2015 tax return, filed as [DE 71-1], alleges gross receipts or sales in the amount of $479,014. The corporate representative Michelle Marcos' Affidavits were inaccurate, incomplete and/or false. For example, in the 6/27/17 Affidavit allegedly $508,518.69 was deposited in the bank account for 2015; however, that Affidavit claims only $483,806.81 constituted "total gross volume of sales" for 2015. Marcos' 7/7/17 Affidavit conflicts alleging a Quickbooks figure of $505,973.33, reduced to $489,117.86 if "**only**" permit fees and sales tax" are deducted. Once again, the items are not automatically deducted from gross sales for FLSA purposes, as discussed herein. On the other hand, if the figures in the 6/27/17 are calculated deducting only permit fees and sales tax, a different alleged gross sales amount is presented ($508,518.69 -$10,258.34 - $6,597.13 = $491,663.22).

[ECF No. 139, p. 8].

To further support their decision to propound a significant amount of discovery, Plaintiff's counsel also emphasize that Ms. Marcos did not know whether wholesale clients pay the majority of sales taxes -- a failure they deem significant because they contend that "whether a customer is wholesale or retail determines whether the taxes are included as gross annual income for purposes of the $500,000 threshold." [ECF No. 139, p. 9].

Moreover, as noted above, Defendants produced an amended tax return for 2015 on September 1, 2017, *after* Plaintiff had moved for partial summary judgment on August 25, 2017.

Given Defendants' lack of consistency in their discovery responses, Plaintiff's counsel's apparent strategy of adopting what Defendants say is a "never say die" campaign toward discovery might be deemed atypically aggressive, but, in my view, it does not, under the fact-specific circumstances of this case, cross the line into sanctionable misconduct.

**<u>Use of Incorrect Summary Charts</u>**

As outlined above, Plaintiff's counsel surprised Ms. Marcos at her July 20, 2017 (second) deposition with a three-ring binder of printouts from Abalux's QuickBooks™ registers for 2013 to 2015. Plaintiff's counsel also provided her with yearly "summaries" prepared by an unidentified person at Plaintiff's counsel's law firm. Defendants contend that the summaries, which were actually charts, "purported to establish that Abalux's Quickbooks registers were unreliable and Abalux's tax returns for years 2014, 2015 and 2016 were inaccurate." [ECF No. 124-11, p. 8]. They also contend that each so-called "summary" contained "a hand-written figure at the bottom that was purported to be the 'true' gross volume of sales for 2014, 2015 and 2016." [ECF No. 124-11, p. 8]. Defendants contend that Ms. Marcos later determined that the "summaries" were incorrect, resulting from "transposed numbers and the poor addition of the unknown person who prepared the 'summaries.'" [ECF No. 124-11, p. 8].

Defendants described the incorrect summaries as a strategy where Plaintiff's counsel "tried to manufacture evidence to create a disputed issue of fact." [ECF No. 124-

11, p. 17]. Because Plaintiff's counsel submitted the summaries to the Court "and never withdrew them after learning of their inaccuracy from Ms. Marcos' declaration submitted in opposition to the PSJ," Defendants argue, Plaintiff's counsel "apparently did not care that the Court might rely on false data to rule on their PSJ." [ECF No. 124-11, p. 18]. As described by Defendants in their sanctions motion and related submissions, "creating evidence to foil entry of summary judgment is the essence of bad faith." [ECF No. 124-11, p. 18].

In their September 1, 2017 verified response to Plaintiff's appeal of a discovery order [ECF No. 61], Defendants submitted a declaration from Ms. Marcos [ECF No. 61-5, p. 7], explaining that the charts which Plaintiff's counsel presented to her at the deposition were inaccurate because they "contained numerous discrepancies caused by transposed figures and poor addition." Her declaration further noted that "whoever copied or typed the documents did not proof-read them" and explained that Plaintiff's law firm "over-reported the number of transactions in 2014 as 1,919 whereas the spreadsheet showed there were only 1,896." [ECF No. 61-5, pp. 7-8]. So Plaintiff's attorneys were, as of September 1, 2017, on notice that the charts and graphs were factually incorrect.

In their opposition response to the sanctions motion [ECF No. 139], Plaintiff's counsel do not contend that the summaries were, in fact, **accurate.** Instead, they refer to Ms. Marcos' "multiple, ever-evolving affidavits" and brand *them* as "inaccurate,

incomplete and/or false." [ECF No. 139, p. 8]. They contend that Ms. Marcos "continued to submit conflicting Affidavits as to the exact sales amounts" and argue that his scenario is why they prepared the "disputed" graphs. [ECF No. 139, p. 9]. Specifically, they say the firm needed to "undertake the time-consuming task of independently and manually evaluating Defendants' Quickbooks Ledgers" to "determine[] the accuracy of inaccurate, misleading, and false sales made/business done evidence produced by the Defendants." [ECF No. 139, p. 9].

Thus, the practical summary of Plaintiff's counsel's position here is that they implicitly concede that the charts their firm prepared were inaccurate but try to minimize the consequences by pointing to alleged mistakes made by Ms. Marcos as justification. If Ms. Marcos made earlier mistakes, then this might explain why Plaintiff's counsel felt the need to prepare their own charts. But the sanctions motion is not based on the theory that Plaintiff's counsel unnecessarily *prepared* the charts in the first place or lacked a rationale for doing so. Instead, the sanctions motion focuses on counsel's submission of incorrect charts and their **failure to correct the mistakes** after learning that their partial summary judgment motion was based, at least in part, on incorrect charts.[18]

---

[18] Plaintiff's counsel refused to make their underlying manual recalculations available to Ms. Marcos and defense counsel for examination and copying, and the manual recalculations were never produced by Plaintiff in discovery either. [ECF. No. 66, p. 12].

Failing to advise the Court that exhibits filed in support of a motion are incorrect after being specifically advised that the exhibits are inaccurate can constitute sanctionable conduct. *See, e.g., Ali v. Mid-Atlantic Settlement Servs., Inc.*, 233 F.R.D. 32 (D.C. Cir. 2006) (entering sanctions against defense attorney who challenged service of process by submitting a noncompliant affidavit that recited spare and selective facts about client's residences and asserting the incorrect legal position that he was never served); *Del Canto v. ITT Sheraton Corp.*, 865 F. Supp. 934, 938 (D.C. Cir. 1994) (entering sanctions against the plaintiff's attorney and noting that the plaintiff's defamation allegations "are contradicted so many ways on this record that the Court must conclude that the plaintiff did not conduct reasonable pre-filing inquiries and that the plaintiff should have realized . . . that [his] claim was not well founded in fact") (internal

---

Plaintiff incorporated the 2015 chart/graph by reference in paragraph 3 of his statement of undisputed facts, which in turn references the chart/graph attached to his objections to the Undersigned's discovery ruling. Specifically, Plaintiff represented that the graphs were the firm's independent evaluation of Abalux's QuickBooks™ ledgers and indicated that the total gross revenues for 2015 was $505,971.14. This statement of undisputed facts also notes that Plaintiff's counsel used Excel and manual calculations to determine the 2015 gross revenues. Defendants flagged this reliance on the incorrect graph/chart in their opposition to Plaintiff's summary judgment motion, but Plaintiff took no remedial steps.

Defendants also noted that the graphs and charts are akin to "unsworn statements made by unidentified declarants who are members of Plaintiff's counsel's law firm." [ECF No. 66, p. 11]. They amplified their position the next day (September 15, 2017), when they filed their own summary judgment motion [ECF No. 68], which Judge Lenard granted.

quotation omitted); *see also Hamburger v. Northland Grp., Inc.*, No. 3:13-CV-01155, 2016 WL 554833, at *7 (M.D. Pa. Feb. 10, 2016) ("We have the power to police our own proceedings and to punish a person who submits false information to us, even if those acts did not have any effect."); *Roberts v. Zeman*, 191 F.R.D. 575, 580 (N.D. Ill. 2000) (entering sanctions award against the plaintiff's counsel because he incorrectly advised the magistrate judge that he had calculated damages to satisfy the $75,000 jurisdictional amount).

To be sure, there is no evidence presented here that Plaintiff's counsel intentionally used bogus evidence. It is entirely possible that Plaintiff's counsel was unaware of the mistakes when the error-laden charts and graphs were presented to Ms. Marcos at her deposition. Nevertheless, submitting a motion referencing charts and graphs and then failing to advise the Court that these documents are factually incorrect after learning of the errors could, as Defendants contend, be analogized to submitting falsified evidence.

Although the Undersigned is not necessarily concluding here that Plaintiff's counsel perpetrated a fraud on the Court, their stubborn refusal to advise the Court that the charts and graphs were factually incorrect is surely serious enough to justify sanctions. *Cf. Plastech Holding Corp. v. WM Greentech Automotive Corp.*, 257 F. Supp. 3d 867, 875 (E.D. Mich. 2017) (imposing sanction of with-prejudice dismissal after plaintiff submitted a fabricated document as an exhibit to its first and second amended

complaints and rejecting the plaintiff's "**mistaken belief**" explanation as unavailing and unsupported by the record evidence) (emphasis added); *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 444 (S.D.N.Y. 2002) (imposing sanctions for submitting falsified evidence and explaining that plaintiff "**failed to correct** her fraudulent submissions, even when **confronted with evidence undermining the validity** of those submissions") (emphasis added).

## Insisting that the Accrual Method Must Be Used (and Not Dismissing the Lawsuit)

To be sure, Plaintiff propounded a large volume of discovery and demanded that Defendants produce witnesses for more than one deposition. There is no doubt that Plaintiff pursued a vigorous and aggressive discovery strategy. But this tactic is not the basis for this sanctions order. In addition to not correcting mistaken (and therefore misleading) exhibits, Plaintiff's counsel clung to an incorrect legal theory and insisted that the accrual method must be used.

Plaintiff's counsel were on notice since at least the August 2017 discovery hearing that Defendants' legal position relied on the cash basis method. Therefore, the Court might be justified in awarding fees and costs as of the August discovery hearing. However, the Undersigned deems it prudent to use the later date of Defendants' response to Plaintiff's motion for partial summary judgment because the memorandum of law provided a comprehensive overview of the specific legal grounds underlying Defendants' position (e.g., the specific Department of Labor regulation from the Code of

Federal Regulations, a specific IRS Publication, and an Eleventh Circuit case).

Plaintiff's counsel repeatedly and stridently urged an incorrect legal argument -- that the accrual method was mandatory. Despite learning of federal regulations, an IRS publication, and case-law authority that permitted Abalux to use the cash method, they did not abandon their incorrect and misplaced view. Given this stubborn failure to concede defeat on jurisdictional grounds, they magnified the prejudice to Defendants by steadfastly refusing to dismiss the case. That was not justified and it warrants a sanctions award.

## When Did the Violations Occur for Purposes of Calculating the Amount?

Similar to the approach they took in *Estrada*, the Zidell law firm and its attorneys offer "no explanation why [they] made no effort" to ask for records concerning the $500,000 jurisdictional theory before they filed the lawsuit. 2018 WL 1836007, at *5.

Although Plaintiff's counsel were aware as of September 1, 2017 that their charts and graphs were incorrect, Defendants did not mention that in a Rule 11 motion until their counsel served the seventh motion on September 19, 2017. Rule 11 requires a 21-day safe-harbor period, so sanctions under Rule 11 for the incorrect charts cannot start until October 11, 2017.

However, § 1927 and the Court's inherent authority do not contain a similar safe-harbor period. Therefore, the Undersigned could conceivably start the sanctions clock on September 2, 2017, the day after Defendants filed their opposition to a discovery

order appeal and mentioned the incorrect charts. *See generally SEC v. Smith*, 798 F. Supp. 2d 412, 426 (N.D.N.Y. 2011) (using inherent power, rather than Rule 11, to authorize sanctions when the SEC failed to technically follow the 21-day safe harbor provision of Rule 11). But the Undersigned will, in an abundance of caution and in recognition of the rule that inherent powers should be exercised with "restraint and discretion,"[19] start the calculation for fees and costs on September 15, 2017, the day after Defendants filed their September 14, 2017 opposition to Plaintiff's motion for partial summary judgment. That response notes both the incorrect charts and graphs **and** the legal specifics explaining why the accrual method is not required (and why Abalux could use the cash basis method).

To be precise, the calculation of fees and costs for § 1927 and inherent authority grounds start as of September 15, 2017 but (if necessary, which it is not under this Order's analysis) the Rule 11 basis begins as of October 11, 2017.

**Trying to Accept an Offer of Judgment after Summary Judgment Was Entered (and Filing a Motion for Reconsideration About This)**

As reflected in Judge Lenard's Order striking Plaintiff's purported notice of acceptance of Defendants' Offer of Judgment and the related Order denying his motion for reconsideration [ECF Nos. 101; 108], Plaintiff's position was fundamentally at odds with the rule that a Rule 68 offer of judgment does not remain open to a plaintiff after

---

[19]     *Chambers*, 501 U.S. at 444.

summary judgment has been entered in a defendant's favor. Although it may well have been bad faith for Plaintiff to take this position, the Undersigned sees no need to decide that issue because the conduct at issue occurred in January 2018, *after* the other conduct warranting sanctions occurred on September 17, 2017. The Court has already pinpointed grounds for starting the attorney's fees and costs clock on September 15, 2017, so it is unnecessary to specify another rationale that happened months later.

**Who to Sanction**

To reference the quote mentioned on the first page of this Order, Plaintiff's counsel should have "surrendered" by voluntarily dismissing Collar's lawsuit after learning that Abalux did not earn sufficient annual revenues to generate the jurisdiction necessary to advance the FLSA claims being pursued. They did not do that, however, so sanctions are warranted.

Rule 11 explicitly prohibits monetary sanctions against a represented party for a Rule 11(b)(2) violation. Fed. R. Civ. P. 11(c)(5)(A). Moreover, it is sometimes appropriate to enter sanctions *only* against counsel, rather than against the client or the client and the attorney. *Worldwide Primates*, 87 F.3d at 1254 (citing *Mike Ousley Prods., Inc. v. WJBF-TV*, 952 F.2d 380, 383 (11th Cir. 1992) (imposing sanctions only on the attorney because it was the attorney, not his client, who breached the duty of reasonable inquiry)).

The Undersigned has found no evidence to suggest that Plaintiff was aware of the legal arguments his counsel was making about the cash basis accounting system or

the submission of flawed summary charts to the Court -- the conduct warranting sanctions. Therefore, the sanctions award will not be against Plaintiff. *See also BCJJ, LLC v. LeFevre*, No. 8:09-cv-551, 2012 WL 2590473, at *3 (M.D. Fla. July 3, 2012) ("it is sometimes proper for the court to impose sanctions on a party's counsel as opposed to the party itself, since it may well be more appropriate than a sanction that penalizes the parties for the offenses of their counsel") (internal quotation omitted).

Likewise, § 1927, entitled "counsel's liability for excessive costs," is, by its terms, directed only at "any attorney or other person admitted to conduct cases in any court of the United States[.]" § 1927. Thus, the statute would not authorize a sanction against Plaintiff, a non-attorney.

Although a court may use its inherent powers to sanction a non-attorney party, the Undersigned declines to pursue that route here. First, Defendants' sanctions motion does not seek an award against the Plaintiff; it seeks an award only against his law firm and the individual attorneys involved in representing him. Second, as noted, there is no indication that Plaintiff was aware that his counsel were pushing the envelope and advancing a legally untenable theory concerning the type of accounting method used or that an unidentified person (or persons) in the law firm had prepared factually erroneous charts and graphs.

The attorneys who were primarily involved in representing Plaintiff and in pursuing the aggressive discovery strategy while failing to acknowledge their incorrect

legal theory are K. David Kelly, Jamie H. Zidell, and Rivkah Jaff. They are attorneys in the J.H. Zidell P.A. firm.

According to the Florida Bar's website, Mr. Zidell has been a Florida bar member since 1994, Mr. Kelly has been a member since 1997, and Ms. Jaff has been a member since 2013.

Mr. Kelly signed the motion for partial summary judgment, the reply to that motion, and the opposition to Defendants' summary judgment motion. In other words, he is the attorney who, for Rule 11 purposes, is responsible for advancing the legally meritless argument that the accrual method of accounting must be used for purposes of calculating annual revenue when assessing whether the $500,000 annual revenue threshold has been met. He is also the attorney who failed to rescind the incorrect charts and graphs referenced in his motion.

Ms. Jaff is the attorney who appears most involved in propounding the large volume of discovery, which, while surely annoying and expensive from Defendants' perspective, is not the conduct prompting the sanctions award. Therefore, the award will not be against Ms. Jaff. Nevertheless, Ms. Jaff should not take a great deal of comfort in this result, as the Undersigned views her discovery conduct as significantly aggressive and extremely close to reaching the abusive limit.

Mr. Zidell's direct involvement seems limited to an appearance at a discovery hearing in which he advanced the accrual basis argument. But that was before

Defendants filed their summary judgment papers outlining in detail the specific legal grounds supporting the use of the cash basis method. Therefore, the sanctions award will not be against Mr. Zidell personally.

However, for practical purposes, that may be an insignificant point, as the Undersigned concludes that the sanctions award should also be entered against Plaintiff's law firm: J.H. Zidell, P.A.

The award (once the Court calculates it, following receipt of Ms. Langbein's submission of documents reflecting fees and costs incurred since September 15, 2017) will be against the firm and Mr. Kelly, jointly and severally. Because the Court does not have intimate knowledge of how the firm allocated responsibilities for the case or which attorney was most involved in advancing a specific theory or in refusing to dismiss the case once it became obvious that Defendants could in fact use the cash basis system, the Undersigned will not further pinpoint financial responsibility for the award between Mr. Kelly and the Zidell law firm.

## Conclusion

The Undersigned **grants** Defendants' sanctions motion [ECF No. 124], directs defense counsel to submit a declaration with supporting backup documents for fees and costs incurred from September 15, 2017, and gives notice that a sanctions award will be entered against Mr. Kelly and the law firm. Mr. Kelly and the law firm will, of course, be permitted to challenge the specifics of the requested award (e.g., the amount of the

hourly rate, the reasonableness of the hours claimed, and defense counsel's billing judgment).

**A Final Observation**

According to CM/ECF, Mr. Zidell's law firm has filed **885** cases in the Southern District of Florida from January 1, 2012 through December 31, 2017 -- a six-year period. It appears as though most, and perhaps all, of these lawsuits are based, at least in part, on the FLSA or similar state statutes governing wage claims. Based on comments the Undersigned has heard from attorneys working (or who have worked) for the Zidell firm and from defense attorneys opposing lawsuits filed in this district by Mr. Zidell's firm, it appears as though Mr. Zidell's firm rarely, if ever, contacts the putative defendant employer or its counsel for information about the wage claim or the annual revenues issue before filing the lawsuit. Likewise, it seems as though the law firm rarely, if ever, sends a demand letter before filing the wage lawsuits.

Thus, it seems as though the law firm's practice is to not conduct pre-filing due diligence involving efforts to obtain information from the employer. If any inquiry is done, then it seems as though it is primarily done through reliance on information received only from the firm's own client -- the plaintiff. Under *Worldwide Primates* and its progeny, this practice could well be classified as a Rule 11 violation in virtually every case where the facts or legal theory prove to be significantly different than the information received from the plaintiff or the assumptions made by the plaintiff.

Given the myriad sanctions orders already entered against Mr. Zidell and his law firm, it appears as though he and the attorneys working in his firm have not been swayed by the sanctions orders. They seem to be indifferent to the possibility that their business model (of filing FLSA lawsuits without first checking the factual and legal theories with the putative defendant) may well generate a sanctions order.

To place this scenario in context, however, it seems as though all of the other firms that routinely file a significant number of FLSA lawsuits in this district follow the same business model -- and do not fulfill their Rule 11 obligations by conducting a pre-filing inquiry with the putative defendant. But the Undersigned is not aware of any "but-everyone-else-does-exactly-what-I-do" exception to Rule 11.

To the extent that Mr. Zidell's firm or other firms are named as violators in future sanctions motions in other cases, the movants might be able to reference this Order (and others cited in it) to support the view that not pursuing a basic pre-filing inquiry about the critical facts with the putative defendant is tantamount to a virtually automatic Rule 11 violation.

Time, as it always does, will tell.

**DONE AND ORDERED** in Chambers, at Miami, Florida, July 5, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to</u>:**
The Honorable Joan A. Lenard
All counsel of record